,UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT BISHINS, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>MARINUS PHARMACEUTICALS, INC., SCOTT BRAUNSTEIN, and STEVEN PFANSTIEL,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Scott Bishins ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Marinus Pharmaceuticals, Inc. ("Marinus" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.       This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Marinus securities between March 17, 2021 and May 7, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's

violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Scott Bishins, as set forth in the accompanying certification, incorporated by reference herein, purchased Marinus securities during the Class Period and was economically damaged thereby.

7.      Defendant Marinus describes itself as a "commercial-stage pharmaceutical company dedicated to the development of innovative therapeutics for the treatment of seizure disorders, including rare genetic epilepsies and status epilepticus, which includes the use of ZTALMY® (ganaxolone)."

8.      Pertinent to this action is the Randomized Therapy in Status Epilepticus trial (RAISE), which the Company has described as a "pivotal Phase 3 trial in refractory status epilepticus (RSE) patients."

9.      Marinus is incorporated in Delaware and its principal executive offices are located at 5 Radnor Corporate Center, Suite 500, 100 Matsonford Road, Radnor, Pennsylvania 19087. Marinus' common stock trades on the NASDAQ exchange under the ticker symbol "MRNS."

10.     Defendant Scott Braunstein ("Braunstein") served as the Company's Chief Executive Officer and as a director throughout the Class Period.

11.     Defendant Steven Pfanstiel ("Pfanstiel") served as the Company's Chief Operating Officer ("COO"), Chief Financial Officer ("CFO") and Treasurer throughout the Class Period.

12.     Defendants Braunstein and Pfanstiel are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     Marinus is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     Marinus and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Materially False and Misleading Statements**
<u>**Issued During the Class Period**</u>

17.     On May 17, 2021, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.     The 1Q21 Report included the following statement:

***Our future success is dependent on the successful clinical development, regulatory approval and commercialization of ganaxolone, which is being studied in clinical trials and will require significant capital resources and years of additional clinical development effort.***

\*          \*          \*

4

*We are conducting the RAISE Trial in RSE, which is a life threatening medical condition involving prolonged seizure activity in seriously ill patients. The RAISE Trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication. Additionally, the clinical trial endpoints of the RAISE Trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE.* Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone. *Even if ganaxolone were to obtain approval from the FDA and comparable foreign regulatory authorities, any approval might contain significant limitations, such as restrictions as to specified age groups, warnings, precautions or contraindications, or may be subject to burdensome post-approval trial or risk management requirements*. If we are unable to obtain regulatory approval for ganaxolone in one or more jurisdictions, or any approval contains significant limitations, we may not be able to obtain sufficient funding or generate sufficient revenue to continue the development of any other product candidate that we may in-license, develop or acquire in the future. Furthermore, even if we obtain regulatory approval for ganaxolone, we will still need to develop a commercial organization, establish commercially viable pricing and obtain adequate reimbursement from third-party and government payers. If we are unable to successfully commercialize ganaxolone, we may not be able to earn sufficient revenue to continue our business.

(Emphasis added).

19.     The statement in ¶ 18 was materially false and misleading because it understated the risks in the RAISE trial, in particular because it omitted the risk to the RAISE trial's viability if it did not meet pre-defined "early stopping" criteria. It further omitted that the Company would stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

20.     The 1Q21 Report contained the following statement about the RAISE II Trial:

Planning continues for a separate RSE trial to be conducted in Europe (the RAISE II Trial). Following a meeting with the EMA in the first quarter of 2021, at which we discussed study design, trial initiation is planned for the first half of 2022. The RAISE II Trial will be a double blind, placebo-controlled pivotal registration study expected to enroll 70 patients who have failed first-line benzodiazepine treatment and at least one prior second-line AED. Patients will receive either ganaxolone or placebo, administered in combination with a standard-of-care second-line AED. The RAISE II Trial in Europe differs from the RAISE trial in the U.S., with the RAISE II Trial using adjunctive ganaxolone that can be initiated earlier in the course of RSE.

21.     The statement in ¶ 20 was materially false and misleading because it omitted that

the viability of the RAISE II trial to continue would depend on the RAISE trial meeting early-stopping criteria.

22.     On August 10, 2021, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to the SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

23.     The 2Q21 Report included the following statement:

*Our future success is dependent on the successful clinical development, regulatory approval and commercialization of ganaxolone, which is being studied in clinical trials and will require significant capital resources and years of additional clinical development effort.*

*                    *                    *

*We are conducting the RAISE Trial in RSE, which is a life threatening medical condition involving prolonged seizure activity in seriously ill patients.  The RAISE Trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication*. Additionally, the clinical trial endpoints of the RAISE Trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE. Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone.

Even if ganaxolone were to obtain approval from the FDA and comparable foreign regulatory authorities for CDD, RSE, or any other indication, any approval might contain significant limitations, such as restrictions as to specified age groups, warnings, precautions or contraindications, or may be subject to burdensome post-approval trial or risk management requirements. If we are unable to obtain regulatory approval for ganaxolone in one or more jurisdictions, or any approval contains significant limitations, we may not be able to obtain sufficient funding or generate sufficient revenue to continue the development of any other product candidate that we may in-license, develop or acquire in the future. Furthermore, even if we obtain regulatory approval for ganaxolone, we will still need to develop a commercial organization, establish commercially viable pricing and obtain adequate reimbursement from third-party and government payers. If we are unable to successfully commercialize ganaxolone, we may not be able to earn sufficient revenue to continue our business.

(Emphasis added).

24.     The statement in ¶ 23 was materially false and misleading because it understated

the risks in the RAISE trial, in particular because it omitted the risk to the RAISE trial's viability

if it did not meet pre-defined "early stopping" criteria. It further omitted that the Company would

stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

25.     The 2Q21 Report contained the following statement about the RAISE II Trial:

> Planning continues for a separate RSE trial to be conducted in Europe (the RAISE II Trial).
> Following a meeting with the EMA in the first quarter of 2021, at which we discussed study
> design, trial initiation is planned for the first half of 2022. The RAISE II Trial will
> be a double blind, placebo-controlled pivotal registration study expected to enroll 70
> patients who have failed first-line benzodiazepine treatment and at least one prior second-
> line AED. Patients will receive either ganaxolone or placebo, administered in combination
> with a standard-of-care second-line AED. The RAISE II Trial in Europe differs from the
> RAISE trial in the U.S., with the RAISE II Trial using adjunctive ganaxolone that can be
> initiated earlier in the course of RSE.

26.     The statement in ¶ 25 was materially false and misleading because it omitted that

the viability of the RAISE II trial to continue would depend on the RAISE trial meeting early-

stopping criteria.

27.     On November 9, 2021, Marinus filed with the SEC its quarterly report on Form 10-

Q for the period ending September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report

were certifications pursuant to the SOX signed by Defendants Braunstein and Pfansteil attesting

to the accuracy of financial reporting, the disclosure of any material changes to the Company's

internal control over financial reporting and the disclosure of all fraud.

28.     The 3Q21 Report contained the following statement:

> ***Our future success is dependent on the successful clinical development, regulatory***
> ***approval and commercialization of ganaxolone, which is being studied in several***
> ***indications and will require significant capital resources and years of additional clinical***
> ***development effort.***

*         *         *

***We are conducting the RAISE Trial in RSE, which is a life threatening medical condition involving prolonged seizure activity in seriously ill patients. The RAISE Trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication***. Additionally, the clinical trial endpoints of the RAISE Trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE. Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone.

*   *   *

Even if ganaxolone were to obtain approval from the FDA and comparable foreign regulatory authorities for CDD, RSE, or any other indication, any approval might contain significant limitations, such as restrictions as to specified age groups, warnings, precautions or contraindications, or may be subject to burdensome post-approval trial or risk management requirements. If we are unable to obtain regulatory approval for ganaxolone in one or more jurisdictions, or any approval contains significant limitations, we may not be able to obtain sufficient funding or generate sufficient revenue to continue the development of any other product candidate that we may in-license, develop or acquire in the future. Furthermore, even if we obtain regulatory approval for ganaxolone, we will still need to develop a commercial organization, establish commercially viable pricing and obtain adequate reimbursement from third-party and government payers. If we are unable to successfully commercialize ganaxolone, we may not be able to earn sufficient revenue to continue our business.

(Emphasis added).

29.     The statement in ¶ 28 was materially false and misleading because it understated the risks in the RAISE trial, in particular because it omitted the risk to the RAISE trial's viability if it did not meet pre-defined "early stopping" criteria. It further omitted that the Company would stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

30.     The 2Q21 Report contained the following statement about the RAISE II Trial:

Planning continues for a separate RSE trial to support a European marketing authorization (the RAISE II Trial). Following a meeting with the EMA in the first quarter of 2021, at which we discussed trial design, trial initiation is planned for the first half of 2022. The RAISE II Trial will be a double blind, placebo-controlled pivotal registration trial expected to enroll 70 patients who have failed first-line benzodiazepine treatment and at least one prior second-line AED. Patients will receive either ganaxolone or placebo, administered in combination with a standard-of-care second-line AED. The RAISE II Trial in Europe differs from the RAISE Trial in the U.S., with the RAISE II Trial using adjunctive

ganaxolone that can be initiated earlier in the course of RSE.

31.     The statement in ¶ 30 was materially false and misleading because it omitted that the viability of the RAISE II trial to continue would depend on the RAISE trial meeting early-stopping criteria.

32.     March 24, 2022, Marinus filed with the SEC its annual report on Form 10-K for the period ending December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Braunstein and Pfanstiel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

33.     The 2021 Annual Report included the following risk disclosure:

*Our future success is dependent on the successful clinical development, regulatory approval and commercialization of ganaxolone, which is being studied in several indications and will require significant capital resources and years of additional clinical development effort.*

*            *            *

*We are conducting the RAISE trial in RSE, which is a life threatening medical condition involving prolonged seizure activity in seriously ill patients. The RAISE trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication. Additionally, the clinical trial endpoints of the RAISE trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE. Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone*.

*            *            *

Even if ganaxolone were to obtain approval from the FDA and comparable foreign regulatory authorities for TSC, RSE, or any other indication under development, any approval might contain significant limitations, such as restrictions as to specified age groups, warnings, precautions or contraindications, or may be subject to burdensome post-approval trial or risk management requirements. If we are unable to obtain regulatory approval for ganaxolone in these additional indications in one or more jurisdictions, or any

approval contains significant limitations, we may not be able to obtain sufficient funding or generate sufficient revenue to continue the development of any other indications for ganaxolone or any other product candidate that we may in-license, develop or acquire in the future. Furthermore, even with regulatory approval for ganaxolone, we will still need to develop a commercial organization, establish commercially viable pricing and obtain adequate reimbursement from third-party and government payers. If we are unable to successfully commercialize ganaxolone, we may not be able to earn sufficient revenue to continue our business.

(Emphasis added).

34.     The statement in ¶ 33 was materially false and misleading because it understated the risks in the RAISE trial, in particular because it omitted the risk to the RAISE trial's viability if it did not meet pre-defined "early stopping" criteria. It further omitted that the Company would stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

35.     The 2021 Annual Report further stated the following:

Planning continues for a separate RSE trial to support an MAA (RAISE II trial). Following a meeting with the EMA in the first quarter of 2021, at which we discussed trial design, and due to the delay in clinical trial supply mentioned above, trial initiation is planned for the first half of 2023. The RAISE II trial will be a double blind, placebo-controlled pivotal registration trial expected to enroll 70 patients who have failed first-line benzodiazepine treatment and at least one prior second-line AED. Patients will receive either ganaxolone or placebo, administered in combination with a standard-of-care second-line AED. **The RAISE II trial in Europe will provide data that is complementary to the U.S. RAISE trial, with ganaxolone or placebo being administered in combination with a standard-of-care AED**. There are two additional key differences from the U.S. RAISE trial. First, rather than including only progression to IV anesthesia as a treatment failure, the endpoint for RAISE II will include any escalation of care. This could be IV anesthesia or another second-line IV AED. Second, the primary analysis for the RAISE II trial will be a responder analysis, with response defined as SE cessation within 30 minutes and no escalation of care within 36 hours. The U.S. RAISE trial specifies a co-primary endpoint, requiring statistical significance for both early onset and durability of effect.

(Emphasis added).

36.     The statement in ¶ 35 was materially false and misleading because it omitted that the viability of the RAISE II trial to continue would depend on the RAISE trial meeting early-stopping criteria.

37.     On May 12, 2022, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were certifications pursuant to the SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

38.     The 1Q22 Report incorporated by reference the risk disclosures contained in the 2021 Annual Report. As discussed, the 2021 Annual Report contained a materially false and misleading risk disclosure.

39.     On August 11, 2022, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2022 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to the SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

40.     The 2Q22 Report incorporated by reference the risk disclosures contained in the 2021 Annual Report. As discussed, the 2021 Annual Report contained a materially false and misleading risk disclosure.

41.     On November 7, 2022, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2022 (the "3Q22 Report"). Attached to the 3Q22 Report were certifications pursuant to the SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

42.     The 3Q22 Report incorporated by reference the risk disclosures contained in the 2021 Annual Report. As discussed, the 2021 Annual Report contained a materially false and

misleading risk disclosure.

43.     On March 9, 2023, after market hours, Marinus filed with the SEC its annual report

on Form 10-K for the period ending December 31, 2022 (the "2022 Annual Report"). Attached to

the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Braunstein and

Pfanstiel attesting to the accuracy of financial reporting, the disclosure of any material changes to

the Company's internal control over financial reporting and the disclosure of all fraud.

44.     The 2022 Annual Report contained the following risk disclosure:

*Our future success is dependent on the successful clinical development, regulatory approval and commercialization of ganaxolone, which is being studied in several indications and will require significant capital resources and years of additional clinical development effort.*

We have only recently received FDA approval of ZTALMY in CDD, and we plan to develop ganaxolone in several additional indications in oral and IV formulations. As a result, our business is dependent on our ability to successfully complete clinical development, scale-up manufacturing, obtain regulatory approval, and, if approved, commercialize ganaxolone in a timely manner. We cannot commercialize ganaxolone in the U.S. in any other indication without first obtaining regulatory approval from the FDA; similarly, we cannot commercialize ganaxolone outside of the U.S. without obtaining regulatory approval from comparable foreign regulatory authorities. Before obtaining regulatory approvals for the commercial sale of ganaxolone for a target indication, we must demonstrate with substantial evidence gathered in preclinical studies and clinical trials and, with respect to approval in the U.S., to the satisfaction of the FDA, that ganaxolone is safe and effective for use for that target indication and that the manufacturing facilities, processes and controls are adequate.

*         *         *

We are conducting the RAISE trial in RSE, which is a life threatening medical condition involving prolonged seizure activity in seriously ill patients. The RAISE trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication. *There is also a risk that the Phase 3 clinical trial of ganaxolone in RAISE will generate data that is not sufficient to support regulatory approvals for this indication. Additionally, the clinical trial endpoints of the RAISE trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE*. Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone. *Even if the RAISE trial shows that ganaxolone is effective, there is a risk that the FDA will require more safety data*

> *generated with IV ganaxolone at the doses given to patients in this trial before approving an NDA or require post approval commitments to generate additional safety data as a condition of approval ganaxolone for use in RSE.*

(Emphasis added).

45.     The statement in ¶ 44 was materially false and misleading because it understated the risks in the RAISE trial, in particular because it omitted the risk to the RAISE trial's viability if it did not meet pre-defined "early stopping" criteria. It further omitted  that the Company would stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

46.     The 2022 Annual Report contained the following statement about the RAISE II Trial:

> Planning continues for a separate Phase 3 RSE trial to support an MAA in Europe (RAISE II trial). We gained alignment on the trial design at a meeting with the EMA in the first quarter of 2021. Due to the delay in clinical trial supply mentioned for the RAISE trial, the RAISE II trial initiation is planned for the second half of 2023. RAISE II will be a double blind, placebo-controlled pivotal registration trial expected to enroll 70 patients who have failed first-line benzodiazepine treatment and at least one second-line AED. Patients will receive either ganaxolone or placebo, administered in combination with a standard-of-care second-line AED. The simultaneous administration of a standard-of-care AED with the trial medication is expected to provide data complementary to that from the RAISE trial. There are two additional key differences between the RAISE and RAISE II trials. First, rather than specifying progression to IV anesthesia as a treatment failure, under the RAISE II protocol any escalation of care will constitute a treatment failure. This could be IV anesthesia or another second-line IV AED. Second, the primary analysis for the RAISE II trial will be a responder analysis, with response defined as SE cessation within 30 minutes and no escalation of care within 36 hours, rather than the co-primary endpoints in the RAISE trial, which require statistical significance to be achieved independently on both the 30-minute and 36-hour outcomes.

47.     The statement in ¶ 46,  was materially false and misleading because it omitted that the viability of the RAISE II trial to continue would depend on the RAISE trial meeting early-stopping criteria.

48.     On May 11, 2023, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were

certifications pursuant to SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

49.     The 1Q23 Report incorporated by reference the risk disclosures contained in the 2022 Annual Report. As discussed, the 2022 Annual Report contained a materially false and misleading risk disclosure.

50.     The accompanying 1Q23 earnings call contained the following exchange between an analyst and Defendant Braunstein:

**Analyst:** Hi there good morning, thanks for taking my questions and congrats on all the continued progress. I just had a few questions on IV Ganaxolone. I guess maybe first off, on the mechanics around the interim, wondering if you could expand a little bit more on the gating factors and timelines we should be thinking about forgetting to the 82 patients, cleaning the data and getting to DSMB evaluation. ***And if this doesn't hit the stopping criteria, what would be the implications for the program both the RAISE trial and the other studies?***

*             *             *

**Alex Aimetti**: [. . .] I will pass it to Scott to answer that last question that you had about, if the interim does not hit.

**Braunstein**: [. . .] ***So I think, Brian, there is no question that we can still hit statistical significance if we don't hit the interim***. And maybe just to add on to Alex, when we begin that interim process, we will continue to enroll patients in a double blind fashion.

If the DSMB said to continue the study, we can do so. We think that would take a few additional months to complete the study. We still have new sites up and running, and we are allowing new sites to come on board through about the middle of the year.

So I expect to be at 70, 75-ish sites by the June timeframe, a lot of reasons for that, which I can go through. But to your question specifically, we would enroll the study and then unblind the data at 124 patients.

***That being said, given the fact that this study has a very high probability of hitting at the interim,*** should it not, I think the likelihood that we have a clinically meaningful drug at the end of the study, without stopping at the interim, is a low probability.

So I think we generally believe where we set the bar for the interim, and Alex talked about a greater than 90% power to show 40% clinical benefit versus placebo. We think that is

14

where the drug needs to come in to have important clinical outcomes associated with it.

So we are making a very strong bet that this drug is working. We will see a low placebo rate and we will have more than sufficient data to file at the interim. And I think that is where our head's at today, Brian.

(Emphasis added).

51.     The statement in ¶ 50 was materially false and misleading because Defendant Braunstein understated the risk of failure in the RAISE trial and overstated the likelihood of success.

52.     On August 10, 2023, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2023 (the "2Q23 Report"). Attached to the 2Q23 Report were certifications pursuant to SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

53.     The 2Q23 Report incorporated by reference the risk disclosures contained in the 2022 Annual Report. As discussed, the 2022 Annual Report contained a materially false and misleading risk disclosure.

54.     On the accompanying earnings call, Defendant Braunstein made the following statement:

*Moving to our clinical pipeline, I want to start with an update on the Phase 3 RAISE trial in the refractory Status Epilepticus, which I'm sure is top of mind for many of you*. Total enrollment continued to move in the right direction, however, the summer months have been a time of turnover for many clinical site personnel, which we believe has resulted in a slowdown in recruitment. This phenomenon has had a much bigger impact than previously anticipated, particularly while our team has continued to work hard and completed the majority of remaining site activations in the second quarter.

As a result of this summer slowdown, which Joe will discuss in more detail, we have moved the interim analysis out three months to Q1 of next year. While we are disappointed in this delay, we believe that it's critically important to continue to enroll the right patient population for a successful trial outcome. *We are confident that the diligent screening*

*efforts by our clinical team and RAISE study sites will drive a placebo rate well within our expectations, creating the opportunity for a meaningful clinical result and putting us in a position to demonstrate a benefit across multiple healthcare utilization measures*.

(Emphasis added).

55.     The statement in ¶ 54 was materially false and misleading because it overstated the likelihood of success in the RAISE trial.

56.     On November 7, 2023, Marinus filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2023 (the "3Q23 Report"). Attached to the 3Q23 Report were certifications pursuant to SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

57.     The 3Q23 Report incorporated by reference the risk disclosures contained in the 2022 Annual Report. As discussed, the 2022 Annual Report contained a materially false and misleading risk disclosure.

58.     The accompanying 3Q23 earnings call included the following exchange between an analyst, Joseph Hulihan (the Company's chief medical officer), and Defendant Braunstein:

**Analyst**: I just want to confirm that at 82 patients, the study is 94% powered to detect a 40% effect size on the coprimary endpoints, but you haven't disclosed the stopping criteria. *And has the stopping criteria changed over time as you look at the enrollment, which has been a little slower than expected, given that if you don't stop at interim, that you can actually spill into maybe a much later time point for the full study to read out*.

**Hulihan**: [. . .] Thanks for the question. Yes, that's absolutely right. It's 94% powered to detect a 40% treatment difference. Actually, we could see statistical significance at a delta lower than that. Down in the range of 25%, we would still see statistical significance. And the stopping criteria are statistical significance. When you do an interim analysis, there's always a spend in the alpha that you have to do. And that works out actually to have -- if we went to the end, it actually would have a minimal impact on the statistical power at the end of the study. But even with a -- it's 0.0293, but that is -- and with that, we have 94% power to detect that 40% delta. So again, well-powered at the interim. Very confident about it.

**Braunstein**: *And Joe, the only I'll add, Joon, to be clear, we have not moved the goalpost at all on that. I think we had very conservative assumptions going into the trial*, as I mentioned earlier, not having a good handle on exactly what the placebo rate would be. We conservatively thought about a placebo rate 30% or higher. And that's clearly, at least what we believe to be the case today, a much -- *we're seeing a much lower placebo rate, which just, in our minds, gives us a lot more flexibility in terms of hitting statistical significance*. But we have not moved the goalpost at all in that regard.

(Emphasis added).

59.     The statement in ¶ 58 was materially false and misleading because Defendant Braunstein, by discussing "conservative assumptions" regarding the RAISE trial, overstated the likelihood that the Company would meet the early stopping criteria.

60.     On March 5, 2024 Marinus filed with the SEC its annual report on Form 10-K for the period ending December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to SOX signed by Defendants Braunstein and Pfansteil attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

61.     The 2023 Annual Report contained the following risk disclosure:

*Our future success is dependent on the successful clinical development, regulatory approval and continued commercialization of ganaxolone, which is being studied in several indications and will require significant capital resources and years of additional clinical development effort.*

In March 2022, we received FDA approval of ZTALMY for CDD in the U.S., and in July 2023, we received EC approval of ZTALMY for CDD in the EU, and we plan to develop ganaxolone in several other geographic regions and additional indications in oral and IV formulations. As a result, our business is dependent on our ability to successfully complete clinical development, scale-up manufacturing, obtain regulatory approval, and, if it is approved, commercialize ganaxolone in a timely manner. We cannot commercialize additional indications or formulations of ganaxolone in the U.S. in any other indication without first obtaining regulatory approval from the FDA; similarly, we cannot commercialize additional indications or formulations of ganaxolone outside of the U.S. without obtaining regulatory approval from comparable foreign regulatory authorities. Before obtaining regulatory approvals for the commercial sale of ganaxolone for a target indication, we must demonstrate with substantial evidence gathered in preclinical studies and clinical trials and, with respect to approval in the U.S., to the

satisfaction of the FDA, that ganaxolone is safe and effective for use for that target indication and that the manufacturing facilities, processes and controls are adequate.

*       *       *

*We are conducting the RAISE trial in RSE, which is a life-threatening medical condition involving prolonged seizure activity in seriously ill patients*. The RAISE trial requires expertise in electroencephalogram (EEG) interpretation, which may be subject to variability, and the FDA or foreign regulatory authorities could find the data generated in this trial inadequate or difficult to interpret, which could delay, limit or prevent regulatory approval for this indication. *There is also a risk that the Phase 3 clinical trial of ganaxolone in RAISE will generate data that is not sufficient to support regulatory approvals for this indication*. Additionally, the clinical trial endpoints of the RAISE trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE. Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone. Even if the RAISE trial shows that ganaxolone is effective, there is a risk that the FDA will require more safety data generated with IV ganaxolone at the doses given to patients in this trial before approving an NDA or require post approval commitments to generate additional safety data as a condition of approval ganaxolone for use in RSE.

(Emphasis added).

62.     The statement in ¶ 61 was materially false and misleading because it omitted the risk of material harm to the Company if the RAISE trial did not meet pre-defined "early stopping" criteria.

63.     The 2023 Annual Report contained the following risk disclosure:

*We are conducting clinical development activities for ganaxolone across multiple indications, and such clinical development activities may not produce favorable results, which could adversely impact our ability to achieve regulatory approval for ganaxolone in such indications.*

We are conducting clinical development activities for ganaxolone across multiple indications. *Success in preclinical studies and early clinical trials in one indication does not ensure that later clinical trials in such indication or other indications will generate adequate data to demonstrate the efficacy and safety of ganaxolone in one or more indications*. Furthermore, unfavorable clinical trial results in one ganaxolone indication may adversely impact our ability to continue to develop such indication or other ganaxolone indications. *A number of companies in the pharmaceutical and biotechnology industries, including those with greater resources and experience, have suffered significant setbacks in clinical trials, even after seeing promising results in earlier studies and clinical trials*. For example, while ganaxolone showed statistical separation from placebo in a Phase 2 clinical trial in adjunctive treatment of adults with focal onset seizures, it failed to show a similar statistically significant separation in a Phase 3 clinical trial for the same indication. *As a result, we discontinued our program in adult*

18

*focal onset seizures and began to focus our efforts on advancing ganaxolone in RSE and pediatric orphan genetic epilepsy indications. We do not know whether the clinical trials we may conduct will demonstrate adequate efficacy and safety to result in regulatory approval to market ganaxolone in any particular jurisdiction or indication*. If clinical trials underway or conducted in the future do not produce favorable results, our ability to achieve regulatory approval for ganaxolone in those indications may be adversely impacted. Further, even if we believe the data collected from our clinical trials of ganaxolone are promising, these data may not be sufficient to support approval by the FDA or foreign regulatory authorities. Pre-clinical and clinical data can be interpreted in different ways. Accordingly, the FDA or foreign regulatory authorities could interpret these data in different ways from us, which could delay, limit or prevent regulatory approval.

(Emphasis added.)

64.     The statement in ¶ 63 was materially false and misleading because it understated the risks if the RAISE trial did not meet pre-defined "early stopping" criteria. It further omitted that the Company would stop clinical trial enrollment in the RAISE trial if the Company did not meet early stopping criteria.

65.     The 2023 Annual Report contained the following statement about the RAISE II trial:

We have commenced a separate Phase 3 RSE trial to support an MAA in Europe (RAISE II trial). We gained alignment on the trial design at a meeting with the EMA in the first quarter of 2021. *The RAISE II trial is a double blind, placebo-controlled registration trial targeting enrollment of 70 patients who have failed first-line benzodiazepine treatment and at least one second-line IV AED*. Patients will receive either ganaxolone or placebo, administered in combination with a standard-of-care second-line IV AED. The simultaneous administration of a standard-of-care AED with the trial drug is expected to provide data complementary to that from the RAISE trial. *There are two additional key differences between the RAISE and RAISE II trials. First, unlike the RAISE trial, which specifies progression to IV anesthesia as constituting treatment failure, any escalation of care – whether an additional second-line IV AED or an IV anesthetic –will fulfill criteria for treatment failure in RAISE II*. This aligns more closely with the European standard of practice for RSE in which IV anesthesia is used commonly than in the U.S. *Second, the primary endpoint for the RAISE II trial will be based on a responder analysis, with response defined as SE cessation within 30 minutes and no escalation of care within 36 hours, rather than the co-primary endpoints in the RAISE trial, which require statistical significance to be achieved independently on both the 30-minute and 36-hour outcomes. We expect to complete enrollment for the RAISE II trial by the end of 2025*.

In 2023, we discontinued the RESET trial, a Phase 2 trial evaluating ganaxolone for the treatment of ESE. We have focused our resources for IV ganaxolone on our RSE trials, i.e., completing the RAISE trial and accelerating enrollment in the RAISE II trial, as well as

developing a proof-of-concept trial in SRSE. SRSE is a life-threatening neurological emergency with high morbidity and mortality, and we have provided ganaxolone to physicians who have requested it for SRSE treatment under eIND applications. To date, 26 patients have been treated for SRSE with ganaxolone. Based on our observations of treatment outcomes in these patients we plan to submit a protocol to the FDA for a proof-of-concept trial of ganaxolone in SRSE.

(Emphasis added).

66.     The statement in ¶ 65 was materially false and misleading because it omitted that the viability of the RAISE II trial (for approval in Europe) would depend on the RAISE trial meeting early-stopping criteria.

67.     The statements contained in ¶¶ 18, 20, 23, 25, 28, 30, 33, 35, 44, 46, 50, 54, 58, 61, 63, and 65 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants understated the risk of failure to meet the early-stopping criteria in the RAISE trial; (2) Defendants did not disclose that a possible consequence of failing to meet the early stopping criteria in the RAISE trial would be that Marinus would stop the separate Phase 3 RAISE II trial; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

68.     On April 15, 2024, before the market opened, Marinus issued a press release entitled "Marinus Pharmaceuticals Provides Update on the Phase 3 RAISE Trial and Reports Preliminary First Quarter 2024 Financial results." (the "April 15 Announcement"). The April 15 Announcement revealed that the RAISE trial had not met early stopping criteria and also that the Company would implement cost-saving measures, stating the following:

[Marinus], a pharmaceutical company dedicated to the development of innovative therapeutics to treat seizure disorders, today announced that an independent Data Monitoring Committee (DMC) *has recommended continuing the pivotal Phase 3 RAISE*

*trial evaluating intravenous (IV) ganaxolone* for the treatment of refractory status epilepticus (RSE) following an interim analysis.

*Marinus has decided to complete enrollment in the RAISE trial at approximately 100 patients with topline results expected in the summer of 2024.* Those results will be used to determine whether to continue development of IV ganaxolone. Marinus remains blinded to the RAISE trial data.

"*While we are disappointed that RAISE did not meet the early stopping criteria*, we will only be able to determine the trial's outcome once we unblind and analyze the full data set," said Scott Braunstein, M.D., Chairman and Chief Executive Officer of Marinus. "We will also be evaluating potential cost-saving strategies to provide the strongest capital position as we approach enrollment completion in the global Phase 3 Trust TSC trial in tuberous sclerosis complex."

\*       \*       \*

The Company continues the successful U.S. commercial launch of ZTALMY resulting in preliminary unaudited net product revenue of between $7.4 and $7.6 million for the first quarter of 2024. Marinus estimates preliminary unaudited cash, cash equivalents, and short-term investments of $113.3 million as of March 31, 2024. *Cost reduction activities to extend the cash runway beyond the fourth quarter of 2024 are under review and are expected to be implemented in the current quarte*r.

(Emphasis added).

69.     On this news, the price of Marinus stock fell $6.22 per share, or 82.7%, to close at $1.30 per share on April 15, 2024. The next day, the price of Marinus stock fell a further $0.10, or 7.69%, to close at $1.20 on April 16, 2024.

70.     Then, on May 8, 2024, before the market opened, the Company filed with the SEC a current report on Form 8-K. Attached to this Form 8-K was a press release in which the Company announced cost cutting measures including:

- *Stopped clinical trial enrollment in the RAISE and RAISE II trials*[;]
- Deferred IV ganaxolone manufacturing investments[;]
- Reduced the Company's workforce by approximately 20%[;]
- Additional cost reductions across both [R&D] and general and administrative (G&A) functions[;]
- Other operational changes to increase overall efficiency of the Company's operations[;]

(Emphasis added).

71.     In the same press release, the Company announced that "***Marinus has stopped the***

***Phase 3 Raise II trial in RSE***; future development in RSE will be assessed following review of

the RAISE topline data[.]" (Emphasis added).

72.     During market hours on May 8, 2024, *Fierce Biotech* published an article entitled

"Marinus lays of 20% of staff to steady ship after IV seizure med's phase 3 struggles", which

illustrated the impact on the Company of the failure to meet the early stopping criteria in the

RAISE trial. It stated, in pertinent part, the following:

> Marinus Pharmaceuticals is implementing a raft of cost-cutting measures in the wake of
> last month's phase 3 struggles—***including jettisoning a fifth of its workforce***.
>
> Employees at the Pennsylvania-based biotech may have been expecting some bad news
> ever since CEO Scott Braunstein, M.D., warned the company was "evaluating potential
> cost-saving strategies" ***in April after an interim analysis of the RAISE trial assessing***
> ***intravenous ganaxolone as a treatment for refractory status epilepticus (RSE) failed to***
> ***meet predefined "stopping criteria."***
>
> ***Now, Marinus has revealed that the strategy will involve reducing its head count by***
> ***around 20% as well as deferring its investments in manufacturing intravenous***
> ***ganaxolone.*** The biotech is also halting enrollment in both the RAISE trial and another
> late-stage study in RSE called RAISE II.
>
> The cost-cutting won't stop there. ***The company also mentioned "additional cost***
> ***reductions across both R&D and general and administrative functions" as well as a***
> ***vague reference to "other operational changes to increase overall efficiency of the***
> ***company's operations."***

(Emphasis added).

73.     On this news, the price of Marinus stock fell $0.14 per share, or 8.91%, to close at

$1.43 on May 8, 2024.

74.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's common shares, Plaintiff and the other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Marinus securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

77.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

81.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

82.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

83.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

25

85.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

88.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential

proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

89.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

90.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

91.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

92.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

93.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

Case 2:24-cv-02430-JP   Document 1   Filed 06/05/24   Page 28 of 30

of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

94.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

96.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

97.      Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

98.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: June 5, 2024                    **THE ROSEN LAW FIRM, P.A.**

                                       /s/ Jacob A. Goldberg
                                       Jacob A. Goldberg
                                       101 Greenwood Avenue, Suite 440
                                       Jenkintown, PA 19046
                                       Telephone: (215) 600-2817
                                       Fax: (212) 202-3827
                                       Email: jgoldberg@rosenlegal.com

                                       Phillip Kim, Esq.
                                       275 Madison Avenue, 40th Floor

New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (213) 519-5876
Email: brian@schallfirm.com

*Counsel for Plaintiff*