```
                  IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                                     .
SCOTT BISHINS, individually          .
and on behalf of all others          .
similarly situated                   . Docket # 2:24-cv-02430-JP
                                     .
      Plaintiff,                     .
                                     . United States Courthouse
      vs.                            . Philadelphia, PA
                                     . September 30, 2025
MARINUS PHARMACEUTICALS, INC         . 11:00 a.m.
et al.,                              .
                                     .
      Defendants.                    .
.........................................................
```

               TRANSCRIPT OF MOTION TO DISMISS HEARING
                 BEFORE THE HONORABLE JOHN R. PADOVA
                 UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiff:     Gonen Haklay
                       The Rosen Law Firm
                       101 Greenwood Avenue
                       Suite 440
                       Jenkintown, PA 19046
                       215-600-2817
                       Email: ghaklay@rosenlegal.com

                       Jacob A. Goldberg
                       The Rosen Law Firm
                       101 Greenwood Avenue
                       SUITE 440
                       Jenkintown, PA 19046
                       215-600-2817
                       Fax: 212-202-3827
                       Email: jgoldberg@rosenlegal.com


For The Defendants:    Koji F. Fukumura
                       Cooley LLP - Library
                       10265 Science Center Drive
                       San Diego, CA 92121
                       858-550-6000
                       Email: kfukumura@cooley.com

Caitlin Bridget Munley
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20005
202-776-2557
Email: cmunley@cooley.com

Craig E. Tenbroeck
Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121
858-550-6000
Fax: 858-550-6420
Email: ctenbroeck@cooley.com

Elizabeth M. Wright
Cooley LLP
500 Boylston ST
Boston, MA 02116
Email: ewright@cooley.com

Ronan A. Nelson
Cooley LLP
10265 Science Center Drive
San Diego, CA 92121-1117
858-550-6160
Email: rnelson@cooley.com

Audio Operator:      Kristin R. Makely, Court Reporter/ESR

Transcribing Firm:   Intellectix Corporation


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Index**

                                        Pgs.

Appearances:                            4


Proceedings (Motion to Dismiss):   4


Oral Arguments For The Defendant:

CRAIG E. TENBROECK, Esq.            4 - 22


Oral Arguments For The Plaintiff:

JACOB A. GOLDBERG, Esq.            22 – 36


Response:

CRAIG E. TENBROECK, Esq.           36 – 38

4

(Whereupon, at 11:00 a.m., the hearing was commenced.)

THE COURT:  Well, good morning, all, and welcome, counsel, to the Eastern District.

CRAIG E. TENBROECK, Esq.:  Good morning, Your Honor.

JACOB A. GOLDBERG. Esq.:  Good Morning.

THE COURT:  We're set to go. Let me just state that this is Bishon- this case is Bishins v. Marinus Pharmaceuticals, Inc., and we have on the Court's calendar this morning, uh, a motion to dismiss filed by the defendant. Mr. Tenbroeck, am I pronouncing your name right?

MR. TENBROECK:  You are.

THE COURT:  Okay. You may proceed, sir.

MR. TENBROECK:  Thank you, Your Honor.

THE COURT:  Let's assume for the time being that, uh, we're not going to convert the motion. So let's really focus on the motion to dismiss.

MR. TENBROECK:  Absolutely.

THE COURT:  Now, it may not work out that way, okay, but, um, that's what I need. I need a focus on the motion to dismiss right now.

MR. TENBROECK:  Absolutely. Okay. Absolutely. So, Your Honor, I'm Craig Tenbroeck. I'm with Cooley LLP in San Diego. I represent the defendants, Marinus Pharmaceuticals and the individual defendants. Marinus is currently called Immedica Pharma USA Inc., and with me at counsel table is Caitlin

Munley, um, also at Cooley. So, Your Honor, this is a fraud case. It's a motion to dismiss. Plaintiff has to plead several things, including that defendants lied to investors, that they knew they were lying or they did so recklessly, and that those lies cause investors to lose money. Now, Plaintiff has taken a stock drop and worked backwards and tried to reverse-engineer a fraud based on the anonymous- or the statements of three anonymous former employees. And those allegations don't satisfy any of the requisite pleading hurdles. Um, and, frankly, they don't make a whole lot of sense. I'm sure Your Honor has read the briefing. Uh-

THE COURT:  I have. Thank you, both- both sides- for submitting such good briefs in this matter.

MR. TENBROECK:  Thank you, Your Honor. If- if you'll indulge me, I'll just take two minutes to set the table, um, just in case some of it's not clear, because there's a lot of statistics being thrown around and things of that nature. But Marinus is a drug company. I think we said in our brief that they make drugs to treat patients with severe seizures. And- and that really downplays it. They make drugs to- to serve patients that have the most severe seizures. One of those conditions is called, it's a bit of a tongue twister, but refractory status epilepticus, which I'll just call RSE or status. And people with RSE have seizures that last for hours. It's a terrible condition. Um, they often- or they fail other

anti-seizure medicines, and they often have to be put into medically induced comas in order to prevent brain damage. And the problem with that is, once you're in a medically induced coma, there's a good chance that you're not going to wake up. And so Marinus was developing a drug called Ganaxolone to treat patients with this condition. And this was an IV-formulated drug, and it did a Phase II trial. The Phase II trial was a resounding success, and so they moved on and developed a Phase III trial. The Phase III trial was to have 124 patients. They were going to be split between the Ganaxolone arm and a placebo arm. So, half and half: some would get the drug; some would get a placebo. And it was going to look at two main things. It was going to look at did patients' seizures stop within 30 minutes of receiving the drug, and did patients avoided getting put into medically induced comas and avoid IV anesthesia for the next 36 hours. Those were the two co-primary endpoints of the study. There were other secondary endpoints, but those were the two co-primary endpoints. Now, one of the issues that arose was that enrollment was much slower than anticipated. There were a lot of reasons for that; a big one was COVID. This trial was taking place in ICUs. Hospitals were overwhelmed. There were months when the company was enrolling a handful of patients each month, so they had to push back dates because they just weren't able to get enough people into their trial. So what did they do? They- they came up with a plan for an interim

analysis. When they had two-thirds of the patients enrolled, they were going to take, uh, take the data, give it to an independent committee, have the independent committee look at it, and the hope was that the drug was performing well enough that they could stop the trial. That was great for the company; that would have been great for patients; that would have been great for everybody. Now, when Marinus did this, it told people why it was conducting the interim analysis, it told people the assumptions that it was making in designing the interim analysis, and it told people what was likely to happen if the drug failed to his statistical significance in interim analysis.

THE COURT:  What didn't it tell people?

MR. TENBROECK:  Say that again?

THE COURT:  What did- what- what did it not tell people?

MR. TENBROECK:  It was perfectly candid with investors, Your Honor. It told investors, "Look, we think this is a well-powered study. We think this study is designed to be 94 percent powered to detrec- detect a 40 percent, uh, differential." Right? It explained where those assumptions came from. It explained why it expected bigger deltas than 40 percent. Um, th- so, and it explained that, look, if this doesn't hit the statistical significance at the interim analysis, then either there's something- a flawed assumption in

8

our trial- or the drug isn't performing as well as expected, and so, you know, it ha- it won't have as much clinical utility as we hoped, and we'll likely stop the trial and reassess.

THE COURT:  Was there any information that it did not tell the people?

MR. TENBROECK:  Well, I'm s- there were certainly details about the interim analysis. I'm sure they weren't fully, you know, they didn't disclose every single thing that they knew internally. But they told people, frankly, I've worked on a lot of security cases, and I- I- I don't think I've ever seen a case where a company so fully disclosed the risks inherent with the clinical trial, what might happen, and why it was making the assumptions that it did. I think the company came out and said, "Look, one of our primary endpoints is based on the behavior of doctors, whether they're going to put people into IV anesthesia. Our assumptions about that we've based on communications with doctors that may not turn out to be correct."

THE COURT:  What does the complaint say about what was not told to the people?

MR. TENBROECK:  So, the complaint says, and the complaint is based on, uh, it- it's a bit disjointed, right? It's kind of mushed together. But the complaint says that one individual at the company, a senior biostatistician, had conducted a calculation, we don't know what it is, that said

the probability of hitting statifical- statistical significance was going to be higher for the interim analysis than if they fully enrolled the trial.

THE COURT: So, we have to assume that's true.

MR. TENBROECK: Well, so, yes and no.

THE COURT: We start off with the assumption that it's true.

MR. TENBROECK: Well, but-

THE COURT: Then you're gonna- you're gonna- you've, uh, asked the court to take judicial notice of several other matters or documents that might pertain

MR. TENBROECK: Well, you have to take as true the allegations and the facts that are alleged in the complaint, not how they're interpreted by Plaintiff's counsel. So what's alleged in the complaint is that this individual said, "I, you know, I think it's going to be a higher bar to his statistical significance at an interim analysis." That doesn't say anything. The fact that you have a smaller population it's a statistical principle that there's going to be a higher bar to hit statistical significance. But to say something is going to be much higher than something else and not tell you what either number is, right? You can't make a comparative statement without providing any of the numbers and have it mean anything, right? Your chance of getting into, you know, University A might be 60 percent; University B might be 80 percent. Well,

10

that's a much higher bar to get into University A. But it doesn't mean that the chances of getting into University A are low or high or whatnot, unless you actually know the numbers and unless you can actually make that comparative statement. So- so, when you ask if you have to accept the allegation as true, you- you have to accept the words that are quoted in the complaint, but the words don't say anything.

THE COURT:  They're true, but insufficient under the, uh, under the Act.

MR. TENBROECK:  What's that?

THE COURT:  They're true, but they're insufficient under the Act.

MR. TENBROECK:  That is 100 percent correct, Your Honor. And, you know, the- the entire case is based on these three confidential witnesses, and- and I think I really want to focus on that, because there are- there's no documentary evidence alleged here, right? The entire case is based on FE1, FE2, and FE3. And so if- if you'll indulge me, I'd like to just take a minute to discuss each of those witnesses individually. And- and the easy one to discuss is FE2 because there's so little there, right? Everything about FE2 is in paragraph 79 of the complaint. And this is- this is what paragraph 79 says. Marinus- FE2 states that they heard multiple Marinus employees discussing that Marinus had decided preemptively to stop the RAISE trial at the interim analysis, regardless of the outcome,

due to financial reasons. Now, opposing counsel doesn't even address that in its opposition, and I think that's because it's not defensible. The- the Third Circuit laid out quite clearly in cases like Avaya and Chubb, Your Honor applied this in Freed, that when you plead a confidential witness, you have to allege detail. You have to say when the witness worked there. You have to make coherent and plausible allegations. You have to say how they, uh, obtained the information that they obtained. And this is the- the vaguest of possible allegations in water-cooler chatter. We don't have any idea when FE2 worked at Marinus. We don't know the identities of these employees that were talking about the RAISE trial, whether they even worked on the RAISE trial. I don't know how you can even do anything with this allegation. And, uh, you know, as I mentioned, those cases that discuss confidential witnesses, they really set out a two-part test. You look at the form of the allegations, how much detail there is, and, as I mentioned, this- this allegation fails on that prong. But even beyond that, you have to then look at the content of the allegations, because this witness could be described in the most detail, right? It could be the highest level confidential witness. If that witness- if what they're saying doesn't establish that something the company said was false, or that the defendants made it with scienter, then it doesn't add anything to the case. And I think, I'm- I'm reading something into the

complaint here, but the theory seems to be that Marinus promised to fully enroll the trial, and FE2's allegation shows that this wasn't true, because Marinus didn't have the money. And I think there are-

THE COURT:  That's how I understand the complaint.

MR. TENBROECK:  Right. And I think there are several problems with that. You know, the big one, and we pointed this out in our brief, is that Marinus never said that it would fully enroll the trial, no matter how the interim analysis played out. It repeatedly said the opposite. And we have that on— before the class period, that's Exhibit E; it said that in Exhibit I, after- er, during the class period; Exhibit O, during the class period. The company repeatedly said, "Look, if we don't hit at the interim analysis, then we haven't made final decisions internally, but, you know, we're likely to stop this trial." And analysts interpret it that way. You know, the other problem with this allegation is the ambiguity of the phrase "financial reasons." That can mean a lot of things. I think, you know, Plaintiff has this implied assumption that stopping the trial for financial reasons means that the company is out of money. The obvious alternative explanation is what the company said: if the interim analysis didn't pan out, then the value proposition of the drug wasn't what they thought it was. And so, it would— why would you throw good money after bad, right? The juice isn't worth the squeeze; we have so many

resources, we're going to use those on other things. So, all that is to say, everything the comp- company was saying publicly is perfectly consistent with what FE2 is saying in the complaint. Now, I'll turn to FE3, and these are paragraphs 81 through 84. And these paragraphs, again, they don't meet the level of specificity that's required by the PSLRA. I think the gist of these paragraphs is that FE3-

THE COURT:  What's missing, specifically?

MR. TENBROECK:  Well, s- so this paragraph and these allegations, to me, I don't even understand how they fit within the larger complaint. The- the gist of these allegations is that someone heard someone else, the head of data, say that there were problems with data integrity somewhere, months before the interim analysis. Right? The company didn't make any statements about data integrity. The corrective disclosure at the end of the class period didn't say anything about data integrity. So, how this fits in is entirely unclear. I mean, I think it's just an example of Plaintiff talking to a few former employees and then trying to cobble a theory of fraud-

THE COURT:  It's an important point, and I'm sure the Plaintiff's counsel will address it specifically.

MR. TENBROECK:  Your- Your Honor, and I think this witness, like the last witness, has some pretty massive form problems in terms of detail, right? What are these problems? Did they have any effect on the interim analysis? You know, the

14

complaint says that FE3 interpreted the head of data talking to one of the defendants as the head of data advising not to conduct the trial. Well, why did FE3 interpret the statement that way? The head of data is not alleged to have said a thing about the interim analysis. And so, I would ask your cour- Your Honor, to really focus on the statements that are attributed to the confidential witness and not how they're characterized in the briefing, because I think sometimes a little hyperbole gets added to the briefing that goes beyond what is actually alleged. And when I- when I talk about this particular witness and the form issues that I just mentioned, well, there are also a lot of content issues, right? The statements that the Plaintiff is challenging in this case are statements like, "We're thrilled to announce that we have exceeded our enrollment threshold for the interim analysis," or, "We have 94 percent power to detect that 40 percent delta," or, you know, "We believe our existing cash will be sufficient to fund our operating expenses for the period after this financial statement is issued." You know, none of those statements make any representations about data integrity, and it's hard to see how the allegations of this confidential witness are in any way inconsistent to say anything about these statements, right? Even if the court accepts that month before the- months before the interim analysis, there were some vaguely described problems with, you know, data integrity. That doesn't go very

15

far toward establishing that when defendants made the statements that they claim were false, that they knew they were misleading investors. One thing has nothing to do with the other.

THE COURT:  Well, the statement means everything's going well, or one could reasonably conclude from the statement that everything's going well when it wasn't going well-

MR. TENBROECK:  Well-

THE COURT:  -according to the complaint.

MR. TENBROECK:  W- well, I'm not sure which statement Your Honor is referring to. So when they say we're thrilled to announce that we have exceeded the en- enrollment threshold, they did exceed the enrollment threshold, right? They proceeded to do the interim analysis. When they say, you know, we have- we believe that our existing cash, you know, will be sufficient to fund our operating expenses for a period of time, they don't take issue with the amount of cash that the company said it had, right? So none of these statements are inconsistent with those specific factual representations. I think Plaintiff is trying to say, well, the general flavor was one of optimism, and these statements show that everything was not so rosy. But the PSLRA demands much more specificity than that. You have to allege which statements were false, you have to allege why that statement was false, and then you have to allege with particularity all facts that lead- that are behind your belief

16

that that statement was false. Not that the general tenor of the statements was too optimistic in hindsight. Now, the— the third confidential witness is FE1, and FE1 is really the centerpiece of the plaint- the complaint. I think FE1 really still only gets two paragraphs, but this is the individual I mentioned at the outset. This is the senior biostatistician. And- and I really want the court to focus on what's alleged. So, according to the complaint, FE1 recommended to one of the defendants, Dr. Hulihan, months before the interim analysis that Marinus should avoid it because his team calculated the power percentage and projected a much higher bar to reach statistical significance. This allegation is vague, it is uncorroborated, and there are almost zero details. So, what was this calculation? You know, as I mentioned, it's a comparative statement. We don't even know what this calculation means. If you're going to allege that a statement was misleading based on information and belief, then you have to allege all facts that support that belief. And here they're saying there was some calculation out in the ether that was, I guess, less optimistic than what the company was saying. But- but they- they never actually take issue with what the company said. Marinus did provide numbers. It said, "Our study has been designed so that at the interim, it is 94 percent powered to detect a 40 percent delta between the Ganaxolone arm and the placebo arm." It explained why it thought the deltas would be, you know, 60 to

70 percent. So it explained why it was optimistic. It explained the assumptions behind, uh, th- those- those estimates, right? So, Plaintiff doesn't say the study wasn't 94 percent power to detect a 40 percent treatment difference. It just says that, based on some undisclosed calculation, you know, this individual at the company, months before the interim analysis, disagreed with the strategy. And I- I think in, you know, in our briefing, in our- we cited, gosh, probably seven or eight cases that stand for the proposition that there's no duty to disclose internal disagreement. Um, the- the First Circuit case in- in Hill pr- is the greatest articulation of that, but I think you also see it in the Third Circuit case in, uh, in Pfizer. Your Honor said something very similar in the Weiner case, right? That just because someone disagreed with the decision doesn't mean there is naturally an obligation to disclose that dissenting view. And really, that's all that's alleged here. Now, Plaintiff has said that there is some duty to disclose contrary to advice, um, under Omnicare, right? Omnicare doesn't help him. I think, you know, opposing counsel reads too much into that case. Omnicare says that a statement of opinion, if you're out making an opinion, can be misleadingly incomplete if you omit known material facts about your basis for holding that view. So a statement like "We believe our conduct is lawful" may be misleading if the speaker withheld the fact that the entire legal team told him

18

otherwise, that it wasn't legal. I don't think that hypothetical is a good fit here. You know, the statement that we believe our conduct is lawful that- that implies one thing. Our attorneys told us that this conduct is lawful. If, in fact, one attorney said the opposite, there's, uh, Omnicare makes clear you don't have to say that, uh, it- it doesn't make your statement misleading. If, in fact, your entire legal team told you that your conduct was illegal, well, that may be a different story, right? Then- then investors may have a reason to complain because it shows, frankly, it's directly contradictory to the statement you're making, and it shows that you didn't have a reasonable basis, or at least implies that you didn't have a reasonable basis for making that decision. And I don't think that's the case here, right? Marinus was not out there saying that, you know, internally, everyone agrees with this strategy. Marinus was providing numbers, the assumptions behind those numbers, and saying why it believed what it did about the interim analysis. And to the extent Plaintiff is alleging that they— they w- withheld some material calculation, they haven't said what that calculation is. And so I- it's difficult to say; it's impossible for the court to say whether that was at all material to the statement that they were making. Now, on Friday, I think opposing counsel submitted a notice of supplemental authority for the Maiden Holdings case. I'm happy to address that case. I don't- I think it's

19

unhelpful for the same reasons that Omnicare doesn't help Plaintiffs, right?

THE COURT:  You can address it specifically-

MR. TENBROECK:  So, so—

THE COURT:  -or you can wait till rebuttal.

MR. TENBROECK:  Yeah, so- well, so- so Maiden Holdings essentially repeated the hypothetical from Omnicare. Um, you know, that case didn't at all opine on whether there's a duty to- to disclose contrary- to- contrary advice. You know, that case involved a reinsurance company, or involves, I should say, it's still going on, um, it involved a reinsurance company, and the allegation was that, uh, the insurer should have disclosed the fact that its historical losses, um, you know, were so great because they conflicted with the statement that they were making about the adequacy of its loss reserves. But there- there wasn't an issue about materiality because the company had said that historical data for one of its largest companies was material. Right? I think the more analogous case to this situation is probably the Prudential case, which is cited in Maiden Holdings, and that's 70 F.4d 668. And, you know, the gist between- the- the allegations were almost the same, except the difference is that the court dismissed the complaint because the complaint did not plausibly allege that the omitted facts were material to the actual statement that was being made. And I think that's the more analogous situation

20

here. You know, turning briefly to scienter, I- I- there's a lot of overlap here because the scienter allegations and the falsity allegations all frow- flow from these confidential witnesses, which I've already addressed. So, the same flaws, you know, that I pointed out with respect to falsity also apply to scienter. But- but there are three additional points that I just want to make. And one is that the opposition makes clear that Plaintiff is proceeding solely on a recklessness theory. So, what does that mean, right? Well, recklessness means something very specific in this context. It means that the risk of misleading investors must have been known to the defendant or so obvious that the defendants must have been aware of it. So that means that when they point to, you know, innocuous statements like, you know, "We're thrilled to have hit our enrollment target," it was so obvious to those defendants that that statement misdis- risked misleading investors because, you know, a biostatistician didn't think that the interim analysis was a good idea. I think there's so much, uh, there's such a gap between those two things that I think it's difficult for any level of recklessness. But there's another implication to them proceeding only under a recklessness theory, and that is that any forward-looking statement is off the table. A number of these statements are forward-looking. To plead scienter for a forward-looking statement, you cannot just allege recklessness. And, in fact, recklessness is a non-culpable

explanation for a forward-looking statement. And that's the Avaya case, 564 F.3d 274. So, if all they're alleging is recklessness, well, then that counts against scienter for any forward-looking statement. And the third point on scienter that I wanted to make, Your Honor, we make this point in our brief, but they haven't alleged any motive whatsoever. Right? And businessmen don't make a habit of committing fraud when there's no motive to do so. And the law doesn't require them to allege a motive, but the law very clearly says, and the Third Circuit said this in Rahman, that it is significant when there is no motive alleged, and that the court can consider that when it evaluates the enter holistically and weighs culpable and non-culpable inferences. And the allegat- er, the- the lack of a motive, I think, is particularly striking here, given that one of the defendants, the CEO, increased his holdings, you know, right at the end of the last period. This is a- a period when the CEO supposedly knew the stock was inflated, and he's putting his own money into the company. It just doesn't make any sense. So I'll touch briefly on loss causation before I sit down, Your Honor. Uh, uh, so I just want to make one overarching point. If a company discloses a risk, and that risk materializes, and the stock price goes down, that's not loss causation. Loss causation requires the materialization of an undisclosed risk. And this company amply described the risks of the interim analysis, why it might fail, why there was no

22

guarantee of success, et cetera, when the interim analysis did not succeed. And by the way, the interim analysis succeeded on one of its two co-primary endpoints by a significant margin. So to say that, uh, you know, there's no basis for their statements and no basis for their optimism. I think that is contradicted by that fact alone, or at least the inference is very difficult to draw. But the fact that the interim analysis didn't succeed and that the stock dropped as a result does not establish loss causation under a materialization of the risk theory, under a corrective disclosure theory, or under any theory. So, unless Your Honor has any questions, I'll- I'll sit down or I'll address them in rebuttal, but- but thank you for your time.

THE COURT:  Okay, thank you. Respond. Good morning, Counselor.

MR. GOLDBERG:  Good morning, Your Honor. On behalf of Scott Bishins, the lead Plaintiff in this case, Jacob Goldberg from the Rosen Law Firm. Your Honor, if I may, I'd like to reset the table. And I'd like to reset the table by reference to the remand of the Supreme Court's Tell Labs case to the Seventh Circuit, and the case is Makor Rights v. Tell Labs, 513 F.3d 702.

THE COURT:  When was that case decided?

MR. GOLDBERG:  It was 2008, Your Honor, 2008. Again, it's on remand from the Supreme Court's Tell Labs decision,

which gives us our scienter standard for these- these 17 years. No motive here is wrong. What the Seventh Circuit writes is, in response to a defendant's argument, why would we do this? Why would we lie on November 7th of 2023 when, in short order, we're going to get these results and something will happen? It just doesn't make sense. And the Seventh Circuit writes, "The argument confuses expected ben- with,' forgive me, 'expected with realized benefits." The defendant may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might outweigh the cost." And there's more discussion, and then the court writes, "The fact that a gamble concealing bad news in the hope that it will be overtaken by good news fails, the fact that the gamble fails, is not inconsistent with its having been considered, though, because of the risk, a reckless gamble." So, resetting the table here. The defendants never said that they did not have the cash to complete enrollment in the RAISE trial. They never said that publicly. In several of the documents, the defendants point to instances where the defendants said, "We considered whether to continue the trial." And then, Your Honor, even as we object, as the Court noted at the beginning, to the defendants submitting all of these documents, some of which the Court cannot take judicial notice of, in Exhibit, let me get it, forgive me, P, Exhibit P, which is Docu- Document 20-18, a Lear Inc. Partners analyst says, "If

the stopping criteria are not met, the company wouldn't continue to enroll patients in the RAISE trial. The company believes that additional enrollment of patients wouldn't drive greater effect based on statistical modeling work." That is certainly what the company said in March when they said to a gathering of analysts, "We intend not- we have made a-" forgive me, "we have made a determination." Before March 5th, they had not made a determination. They said it might be likely; they were questioned, they went back and forth. On March 5th, they say they've made a determination not to continue for that reason. In resetting this table, Your Honor, what FE1 tells us is in the context of the defendants being bullish about the interim results, my friend, Mr. Tenbroeck's words, not mine, "bullish," in the context of their saying "we are very confident," in the context that they- that they stated publicly that they were committed to completing enrollment, and that they had the cash to do it, the defendants decided to perform the interim analysis in the face of the senior-most biometric personnel and the senior-most data personnel, and I'll- I'll get to that in a second. They decided to do it because they didn't have the money. That's very different. That's a gamble. And our complaint does not allege, Your Honor, that defendants were not able to take that gamble. They were. That's a business strategy. What they were not able to do was to avoid disclosing to the market that their senior-most biometric personnel and

that person's team, and the senior data person had said, "Don't do the interim analysis." Now, the reason to say "Don't do the interim analysis" is not because they thought it was successful. My friend says that the complaint lacks certain details. It doesn't need them. "Don't do the interim analysis" means from a biometric, from a biostatistical perspective, we have a far lower chance of succeeding. And the response, and I want to go back to Exhibit P, the response by Dr. Hulihan, defendant Hulihan, Your Honor, is we- w- w- he doesn't argue with FE1. FE1 doesn't say, Hulihan said, "No, no, no," and I'm going to quote the analyst again, "We feel that additional enrollment of patients wouldn't drive greater effect based on statistical modeling work." That's- that's what they told analysts. But that's not what Dr. Hulihan told FE1. Instead, Dr. Hulihan said to FE1, "We- we can't do it. We don't have- we don't have the cash." That they never told the market. So when my friends say that the defendants disclose, and, again, they put in a plethora of documents to show, when defendants disclose first that they may not continue enrolling after the interim analysis, when they say, finally, "we determined not to," they never say, "it's 'cause we don't have the money." You know, my friend boasts of the success of this drug. This drug is a success with respect to effect, but there were two co- two co-primary endpoints. The two were the effect- brilliant- and whether it helped to avoid the standard of care, which is IV

anesthesia. There, it failed in the interim analysis to reach statistical significance. This is what the- if you read this complaint together, Your Honor, this is the case. It's not that they weren't permitted to do the interim analysis. They were. It's not that they weren't permitted to make business decisions. It's that, in the face of having made those decisions, having taken that gamble, the defendants had, and I use this phrase very- in a very considered way, the defendants had actual knowledge, Your Honor, actual knowledge, that the biometrics team and the data team said, "Don't do it," which means you're not going to succeed or the likelihood is far lower. These people talk in statistics, Your Honor, something that, forgive me, if we go to trial in this case, I will have it down. But right now, I- I'm not a statistician or a biometrician. So then the question becomes, what did defendants say publicly? My friends try to parse this complaint, separating, and I think it's paragraph 95, this exchange with an analyst where they discuss the statistical metrics for the interim results. And in that colloquy, there are two things that go on. Number one, the analyst says, "Well, w— you know, what happens if you- if you don't succeed and you have to enroll everybody 'cause you're enrolling slowly?" They never say, "We're- we're terminating after this. We're not doing it." But what they do say, they express confidence. They say it's well-powered. They say they have- th- th- this analysis gives

them flexibility. These are statements of opinion. And in the face of that opinion, Your Honor, which they're entitled to have and to believe, Dr. Hulihan and Dr. Braustein- Braustein may have believed their opinion that they were confident in the interim results. But once they say that, Your Honor, what Omnicare teaches, and the reason we put in the Maiden case is it be- it- it- it re-reviews, forgive me, it restates what Justice Kagan had written in, uh, in Omnicare. And then the Third Circuit adds, "On the one hand, if the speaker's full team of in-house attorneys told him the conduct was illegal, but the speaker did not reveal, investors would have cause to complain." So I ask you, and we po- we posit that what is the difference between the- the bi- senior most biometrics personnel and their team, which is what the complaint says, saying, "Don't do this analysis," and the law- the lawyers, the whole team, saying, "What you're doing is illegal." Your Honor, in the legality circumstance, presumably no government or regulatory agency has filed a complaint against the company, because if they had, they'd have to disclose that, and then the market could assess the risk of the illegality. Presumably, they say if- if the- the company says, if the defendant says, "We believe we're acting lawfully," when the lawyers say, "You're not acting lawfully," then it doesn't matter whether the defendants believe the legality of their actions. The law team has said, "You're doing something wrong," and then Justice

Kagan's principle, as enunciated by the Third Circuit, is, if you don't disclose what the legal team told you, you are misleading investors. So how- eh, eh, I- my- my friend says that the Maiden case is generally inapplicable, and I agree. That was my case, Your Honor. It is my case, thank heaven. And in that case, it was about reserves, and there was actual data. It was about loss ratios. But the Third Circuit enunciates this as a helpful guide. This case is directly on point. The analogy between the biometrics team saying, "Don't do this," and the data team saying, "Don't do this," and the legal team saying, "What you're doing is illegal," and again, this is all ex ante. It's all before any government has determined that you've done something illegal. It's all before the interim analysis. Doctors Hulihan and Braustein, Your Honor, were perfectly within their rights to believe their opinion. What they were not permitted to do under Omnicare and Maiden is to avoid telling the market that there's a material contrary opinion by teams of people, including the most senior persons on those teams. So again, Justice Kagan says if the most junior lawyer dissents from the legality determination, the senior lawyers say it's legal, the junior lawyer says this is not legal, that you do not have to disclose. But right here, it says if the team says it's illegal, then you do. It doesn't mean you have to change your opinion. It just means you have to disclose, and if you don't, as the Third Circuit says, investors have a right

to complain. When the defendants say they're confident in November, having been told by biometrics personnel and data personnel that they cannot- that the probability is far lower if they do the interim analysis, that is something they have to disclose, or they risk deceiving investors. Now, this does not mean, again, think about the Matcor rights, think about the Tellabs case in the Seventh Circuit. They are entitled to take the gamble. They just can't withhold the information. They could have done exactly the same thing. Now, with respect to the cash flow statement, Your Honor, the defendants say- and the Stone-Moore case in the Third Circuit counsels this Court to read everything together, not just individual statements within a paragraph, but also the paragraphs, because the disclosures are effectively a packet of disclosures. So, in November, they say, "We intend to complete the RAISE trial." Could they have meant something different? Sure, they could have meant something different. They could have meant, "We intend to complete it at the interim," but they didn't say that. They said "complete," and that has meaning. And then, with respect to cash, they said, "We have sufficient cash to complete the trial." But the point about FE1 is, again, Dr.- Dr. Hulihan didn't say, "No, no, no, no. I disagree with your analysis. I disagree with your analysis." What Dr. Hulihan said was, "I- I- I don't know. I- I-, we don't have the money." They never said that. They never said that to analysts. So even as

30

they said, "We're going to terminate enrollment after the interim," they- that had nothing to do with the cash issue, as the complaint pleads from a witness who talked to Dr. Hulihan directly, who worked directly with him day after day. Your Honor, you had a case, uh, uh, 20 years ago called Freed. In the Freed case, uh, uh, uh, ex-partners and still friends of mine argued that certain employees at a hospital facility in one location said things were going wrong, and then they said employees from another location. But they never had anyone who was in the C-suite or in the accounting function at the central location. And the Court said, "Well, it's nice that you have these people, and I'll credit the allegations, but that does not get you to scienter." Juxtaposing that to this case, the witnesses in this case have- well, FE1 has direct and day-to-day contact with Hulihan. FE1 is the senior-most biometrics person at the company, and they and their team have said to Hulihan, "Don't do it." The data person we know from FE3 is Mr. Laskaris. He's the head of data. And in or around paragraph 55, Your Honor, we disclose, we don't have to discuss it now unless you want to, unclean data. If the data's bad, the risk of failing to find statistical significance increases. The complaint pleads that, it summarizes that, and then it says that Mr. Laskaris, that's naming him. By the way, Your Honor, my friend started with anonymous witnesses. They know exactly who FE1 is; he was the senior-most biometrician at the company.

There's no hiding that. So we've described him with particularity, and they know exactly who he is. And they also know who George Laskaris is, Your Honor. Mr. Laskaris is the head of data. We name him. FE3 heard conversations. This isn't water-cooler talk, where someone told someone, told someone, and I heard it at the water cooler, that the Court would reject. This is FE3 participating in calls in which FE3 heard Mr. Laskaris say, "The data is not right," and that means we should not be doing this interim analysis. All of this, Your Honor, means that the defendants had actual knowledge that there was a far lower probability than the confidence they expressed to the market. Again, they were perfectly permitted to do it. They were perfectly permitted to say to the market, "We don't have the cash; we've got to- we've got to truncate this analysis." They didn't. That's not what they- that's not what they said, and that's not what they ever said. Even as they did say, Your Honor, then you shouldn't consider these documents, but I can't unring the bell; you have them. Even as they did say in March, "we've determined not to proceed beyond." The trial was- ended up being a smashing success. The defendants have said all along that they don't have, uh, that- that variations between locations are a difficulty for this trial. In other words, one doctor might rush to IV anesthesia and another might wait, and that could impact the results of the study. That's what the problem was. The problem was- the-

32

the- the point that the co-primary endpoint they failed to reach was not efficacy, Your Honor, 93 percent of those on the drug had a treatment effect, and only 18 percent of the placebo ceased seizing within 30 minutes. Then the question beca- became: how long did it take before, or if, or before the site, the doctors used IV anesthesia? That's where it failed. But that's where the data comes in. That's where the variations among e- everything come in. And this is one of the reasons that the biometrics team and the data team said, "Let's wait to 124." That's what this study is powered for. You know, I want to talk about the cash statements because the defendants say these are forward-looking statements. They're absolutely not. There- I- I- the- in Avaya, Your Honor, the Court refers to a First Circuit case, I think it's called Stone & Webster, and in that case it says if you say you have the cash and you know you don't have the cash, yes, it's- it's about the future, but saying you have the cash now is a present part of that future statement. And in that way, that's exactly on point here. Dr. Hulihan and Dr. Braustein know, in November of 2023, that they do not have the cash, and they say, "We intend to complete the study, and we do have the cash." That's directly at odds with what they know, actually know, at the time. Next, Your Honor, the defendants have said that the safe harbor protects these statements. It does not. It doesn't, because any cautionary language about cash is meaningless in the context of the

33

defendants knowing the tasks they have in for- in front of them and that the cash they have will not satisfy both trials. So there's no meaningful cautionary language, and there I- I- I'm trying to think of a better knowledge fact than an actual defendant saying we do not have the cash that we just said we had in our- in our November disclosures. So not only was the mean- the cautionary language about cash meaningless, but the defendants acted with actual knowledge. My friend chides me, rightly, for a heading that I have that says "The complaint pleads recklessness." But we didn't give up knowledge, Your Honor. Throughout our briefing on scienter, we said "the defendants acted with knowledge." I made the error in the heading of that- in that heading, but in the brief, it is completely clear that we say these defendants acted with actual knowledge. Um, Your Honor, I want to talk briefly about scienter, and the- the Ninth Circuit has said something that I- I think should be obvious. Sometimes, the facts of falsity, and I think my friend referred to this, the facts of falsity and the facts of scienter sort of coalesce into one. Sometimes not, but sometimes they do, and this is one of those instances. FE1 and Mr. Lask- well, FE1 provides information about direct communications with the defendant, telling that defendant not to do the interim analysis and learning from that defendant, "Well, I- I- I- whatever happens, I don't have the cash. We can't do it." And that's the reason. Um, so I- I- I- therefore,

defendants were minimally reckless with respect to their opinion statements, Your Honor, and, with respect to the statements about cash, to the extent they are forward-looking and the safe harbor may apply, they acted with actual knowledge. They did not have the cash they said that they had to complete the Rays' trial. Next, Your Honor, um, if I may talk briefly about loss causation, because I think there's, um, there's a- a bit of confusion, and I- I- I'm— the Monroe County case on which my friends rely, um, is sort of at odds with the Arconic case, on which Howard vs. Arconic, on which we rely. And the Howard vs. Ar- Arconic case, and Monroe County's no different, Howard vs. Arconic case, it says, "If you have failed to disclose," and here's the important language, "some or all of a particular risk, when the risk materializes, that's loss causation." Um, the defendants did not disclose the risk that they were out of cash. They did not disclose the risk that there was a far lower probability of reaching the co-primary endpoints at the interim analysis, thereby disabling investors from understanding the true risk of failure. Judge Scheindlin in Monroe County seems to mix up a truth-on-the-market defense with loss causation. There's no question in Monroe County that the Argentinian government's nationalizing this oil company was a precipitating event that caused loss. The truth-on-the-market comes in, Your Honor, as you wrote in the Weiner case: the truth-on-the-market defense comes in by upending the material

nature of a disclosure. In other words, once you know that the Argentinian government is going to nationalize the oil company, the- the statement becomes immaterial. It doesn't mean that the nationalization itself doesn't cause you loss, but the statements become immaterial. They're inactionable. That's what truth-on-the-market is. But let me go through the facts of Monroe just briefly, Your Honor, because they go from January, where the Argentinian government accuses the oil company of not investing resources and raises the possibility of nationalization, to a meeting with the president, where Cristina Fernandez says, "You're not doing what you said you're doing. We're gonna nationalize you." The whole risk is disclosed there. The false statements were, "You weren't investing as you were supposed to be investing, as you said you invested." There were two things that caused loss when- when it materialized. One is you didn't do what you were supposed to do, and two is we're going to nationalize you. So Monroe County is inapposite. Arconic is the case, and what this case- what our case is about, Your Honor, is failing to give the entire risk, disabling investors from understanding material risks that existed beyond what defendants said. And therefore, when the defendants announce that the interim results have failed to meet both co-primary endpoints and that they were terminating the- the study, the stock price fell because the drug was effectively, uh, uh, uh, not a winner in that sense yet. And

36

that's loss causation. Your Honor, one last thing, if I may. Um, we believe that we have pleaded securities fraud in this case, material falsity with respect to opinions, and with respect to the cash statements. We believe we've pleaded scienter, and we believe we've pleaded loss causation. If, however, the Court decides differently, we ask you to give us 30 days to see whether we can satisfy any deficiency the Court finds through a motion to amend the complaint. If the Court has no questions, I'm- I'm- I'm happy to sit down.

THE COURT:  I have no questions.

MR. GOLDBERG:  Thank you, Your Honor.

MR. TENBROECK:  Thank you, Your Honor. I'll just make four quick points. One is that I heard surprisingly little attention in a fraud case to the actual statements that defendants made when opposing counsel was making his argument. The argument seems to be that the general sense of optimism was misleading because the company did not disclose the full risk. What we didn't do is actually address the specific statements that were made, explain why those statements were made, and the beliefs underlying that- those allegations, right? And- and, you know, I have tremendous respect for opposing counsel, but I- I'd like to add, I think that there tends to be an overstatement of what is actually alleged in the complaint in some instances, right? Defendants do not al- or Plaintiff does not allege that the defendants were telling people behind the

scenes, "We're out of cash." They're- they're- they have a couple vague references to finances or due to finances, which can mean any number of things. As I mentioned, the plausible, more compelling inference, frankly, is that the company just said, "Look, if this fails at the interim analysis, why would we continue enrolling people in a trial that doesn't appear to be working?" S- so opposing counsel did mention that the cash statements, and these are statements about we think we have enough cash to meet our operating expenses through X-date. Right? There are a few of those. He says those are present-tense statements, not forward-looking statements. The present tense aspect of those statements is not being challenged. The company said, "We have X dollars of cash and cash equivalents." They're not saying any of that is false. They're saying what's false was whether that would, in the long term, be sufficient to meet the company's needs. And that's a forward-looking statement. That's a- a quintessential forward-looking statement. Uh, the- the BioLine case addressed- that were those precise types of statements and determined that they're forward-looking. Now, what- I'll talk briefly about Omnicare, right? The- the allegation, uh, that opposing counsel is making, or the argument that opposing counsel is making, is that Omnicare provides an obligation to say if anyone internally, as long as they're senior enough, if anyone internally has a different strategic view, then you have an

obligation to disclose it. And- and that's just not what Omnicare says. And we've cited a number of cases in which courts have expressly held that that obligation does not exist. I- I mentioned the- the Hill case earlier. The Hill case is great. The Hill case is a case involving a, uh, a company that was making statements about its billing practices. Um, the company had hired two internal heads of reimbursement who said, "These billing practices are unsustainable." Said this to the executives. "They're possibly illegal. You shouldn't do it." The company had talked publicly about the risks of its billing practices, and what the court said is that, look, when they describe the risks of those practices, we're not going to hold that they committed securities fraud because they did not dos- describe those risks as serious. And we're not going to say that they have an obligation to disclose every internal disagreement. When the risk is disclosed, the risk is disclosed. And that's precisely the case here. There are no statements that they point to where Marinus Pharmaceuticals made a statement that led investors in the wrong direction. That's simply the case. And that's all, Your Honor.

THE COURT:   Thank you. Uh, counsel, just stand by. We're gonna—we're gonna take a short recess. I'm gonna look over my notes to see whether or not we need you to address anything further. So just stand by.

(Recess taken)

39

THE COURT:  -for coming. Each of you did a good job for your clients, and um, uh, you know, I- I hope our job is as- as easy as you were, and I say that smugly. Okay? Have a good trip back, uh, and I'm sure we'll see you again.

MR. TENBROECK:  Thank you, Your Honor.

THE COURT:  Okay.

(Proceedings concluded at 12:10 p.m.)

40

C E R T I F I C A T E


        I, court-approved transcriber, certify that the
foregoing is a correct transcript from the official electronic
sound recording of the proceedings in the above-entitled
matter.


*Casey Kern*
_____        10/27/2025
Signature of Transcriber                   Date


Casey Kern
_____
Typed or Printed Name