IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT BISHINS, individually and on behalf of all others similarly situated | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| MARINUS PHARMACEUTICALS, INC., ET AL. | : | NO. 24-2430 |

**MEMORANDUM**

**Padova, J.**                                                                                      **March 11, 2026**

This is a putative class action brought by Plaintiff Scott Bishins on behalf of persons or entities who purchased or otherwise acquired the securities of Marinus Pharmaceuticals, Inc. ("Marinus") between November 7, 2023 and May 7, 2024 (the "Class Period"). (Am. Compl. ¶ 2.) The Amended Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by making untrue statements of material facts or failing to state material facts necessary in order to make their statements not misleading, with respect to two clinical trials being carried out by Defendants. Defendants have moved to dismiss the Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, we grant the Motion in part and deny the Motion in part.

I.      **BACKGROUND**

        A.      Ganaxolone

Marinus is a pharmaceutical company involved in developing ZTALMY® (ganaxolone) for the treatment of seizure disorders. (Id. ¶ 21.) Defendant Scott Braunstein, M.D. served as the President, Chief Executive Officer, and director of Marinus at all relevant times. (Id. ¶ 12.) Defendant Steven Pfanstiel served as the Vice President, Chief Financial Officer, Treasurer, and

principal accounting officer of Marinus at all relevant times. (Id. ¶ 13.) Defendant Joseph Hulihan, M.D. served as the Chief Medical Officer of Marinus at all relevant times. (Id. ¶ 14.) In March 2022, the FDA approved ZTALMY oral suspension CV for the treatment of certain kinds of seizures. (Id. ¶ 21.) Marinus commercialized ZTALMY in the third quarter of 2022. (Id.) Sales of the drug produced net revenues of $5.4 million in the three months ending on September 30, 2023. (Id. (quotation omitted).) Marinus also developed ganaxolone for "treatment of other rare genetic epilepsies, including Tuberous Sclerosis Complex (TSC) and . . . Refractory Status Epilepticus (RSE)." (Id. ¶ 23.)

"Status epilepticus (SE) is a life-threatening condition characterized by continuous, prolonged seizures or rapidly recurring seizures without intervening recovery of consciousness." (Id. ¶ 24.) SE has to be treated urgently, or it can lead to permanent neuronal damage. (Id.) The first-line treatment is benzodiazepine. (Id.) "Patients with SE who do not respond to first-line benzodiazepine treatment are classified as having established SE (ESE) and those who then progress to and then fail at least one second-line antiepileptic drug (AED) are classified as having RSE [or refractory status epilepticus]." (Id. (alteration in original).) "Patients with RSE unresponsive to one or more second-line AEDs may be given an IV anesthetic to terminate seizures and prevent neuronal injury and other complications." (Id.) There are approximately 156,000 cases of SE in the United States and Europe every year. (Id.) Half of patients with SE progress to ESE and half of the patients with ESE progress to RSE. (Id.) Marinus believed that "ganaxolone may provide a therapeutic benefit as second-line therapy for patients whose SE is refractory to treatment with benzodiazepines." (Id. ¶ 25.) During the Class Period, Marinus conducted a Phase 3 trial of ganaxolone in RSE patients, called the RAISE Trial. (Id. ¶¶ 25, 36.)

B.    The RAISE Trial

Clinical trials usually occur in three phases. (Id. ¶ 28.) Phase 1 trials, which usually test the drug on healthy volunteers, are designed to evaluate drug safety and side effects, and may also generate evidence of effectiveness. (Id.) Phase 2 trials are "conducted in patients with the targeted disease or condition, to determine dosage tolerance and optimal dosage," identify side effects and safety risks, and obtain evidence of effectiveness. (Id. ¶ 29.) Phase 3 trials are trials are intended to evaluate dosage, clinical effectiveness and safety," establish the benefit-risk relationship of the investigational product candidate, and provide a basis for drug approval. (Id. ¶ 30.) If all of the required testing of a drug is successfully completed, "detailed investigational product candidate information is submitted to the FDA in the form of an NDA to request market approval for the product in specified indications." (Id. ¶ 32.)

Marinus's 2020 Form10-K stated that, in the fall of 2019, it had announced "positive top-line results" in its "Phase 2 clinical trial evaluating IV ganaxolone in patients with RSE." (Id. ¶ 35.) The Phase 2 trial had tested ganaxolone on 17 patients "who received an infusion of IV ganaxolone for up to 96 hours added to the standard-of-care for treating RSE." (Id. (quotation omitted).) According to Defendants, none of the patients in the Phase 2 trial had to be treated with IV anesthetics within 24 hours of the initiation of treatment. (Id.)

Marinus enrolled its first patient in the RAISE trial in January 2021. (Id. ¶ 36.) Marinus expected to have 80 trial sites in hospitals in the United States and Canada and to enroll 124 patients who would be randomly assigned to receive either ganaxolone or a placebo in addition to the standard of care. (Id.) Marinus stated in its 2022 Form 10-K that the RAISE "trial [was]

3

designed to provide over 90% power[1] to detect a 30% efficacy difference between ganaxolone and placebo." (Id.)  The 2022 10-K also included information about the endpoints for the RAISE trial and "an amendment to the trial protocol" that would allow "an interim analysis of the data well before the RAISE trial enrolled 124 patients." (Id. ¶ 37.)  "[T]he co-primary endpoints for the RAISE trial [were] (1) proportion of patients with RSE who experience seizure cessation within 30 minutes of treatment initiation without other medications for SE treatment, and (2) proportion of patients with no progression to IV anesthesia for 36 hours following initiation of the study drug." (Id.)  The 2022 Form 10-K further stated that Marinus had changed the protocol for the RAISE trial in June 2022 to expand the eligibility criteria for patients to facilitate enrollment in the trial. (Id.)  That Form 10-K also stated that the FDA had agreed to the change to the eligibility criteria for the trial and had also agreed to a "proposal for a potential interim analysis when two-thirds of the patients (approximately 82) have completed the trial."    (Id. (emphasis omitted).)

Marinus's Form 10-Q for the period ending March 31, 2023, which was filed on May 11, 2023, states that Marinus "anticipate[d] reaching the enrollment target for the interim analysis by the end of 2023" and that Marinus believed that "positive interim RAISE trial results could be adequate for regulatory filing purposes in RSE." (Id. ¶ 64 (emphasis omitted).)  Marinus also stated in this Form 10-Q that it expected to announce top-line data from another ganaxolone trial, the TrustTSC trial, by mid-2024.[2] (Id. ¶ 65.)

---

[1] The term "power" refers to the "'power' to detect statistical significance." (Am. Compl. ¶ 46.)  Power of at least 80% is desirable. (Id.)  "Power proportionately increases as the study sample size increases." (Id.)

[2] The TrustTSC trial tested the use of oral ganaxolone to treat TSC, which is a leading cause of genetic epilepsy. (Id. ¶ 61.)  The TrustTSC trial was a Phase 3 trial that was "actively enrolling patients in the U.S., Spain, Germany and the United Kingdom" and Marinus expected the trial to involve 160 TSC patients in up to 90 sites. (Id. ¶ 62.)  Marinus's 2022 Form 10-K states that

Marinus also mentioned the FDA's approval of the potential interim analysis in its June 30, 2023 Form 10-Q, which it filed on August 10, 2023.  (Id. ¶¶ 40, 66.)  This Form 10-Q reported that Marinus expected to reach the enrollment target of 82 for the interim analysis and announce topline data for the RAISE trial in the first quarter of 2024.  (Id. ¶ 40.)  This Form 10-Q also stated that Marinus expected to "announce top-line data from the TrustTSC trial by mid-2024."  (Id. ¶ 66.)  On November 7, 2023, in a press release announcing its Third Quarter 2023 financial results, Marinus announced that it had enrolled 75% of the patients that it needed for an interim analysis of the RAISE trial and that it anticipated completing enrollment for the interim analysis in the first quarter of 2024 with topline data expected in the second quarter of 2024.  (Id. ¶ 41.)

Marinus's 2023 Form 10-K, which was filed with the SEC on March 5, 2024, also stated that the interim analysis, the RAISE trial would "have over 90% power to detect a 40% difference in treatment outcomes between ganaxolone and placebo" and that the company had "reached the enrollment target for the interim analysis in the first quarter of 2024."  (Id. ¶ 45; Defs. Ex. L at 24.[3])  The 2023 10-K also stated that if Marinus met the stopping criteria for the interim analysis, it expected that the interim analysis with top-line data readout would be available in the second

---

Marinus planned "to announce top-line data from the TrustTSC trial in the first quarter of 2024." (Id. (emphasis omitted).)

[3] Defendants have submitted a portion of Marinus's 2023 Form 10-K as Exhibit L to the Motion to Dismiss.  We may consider Marinus's 2023 Form 10-K in connection with this Motion to Dismiss because Plaintiffs do not dispute the authenticity of this document and paragraphs 45 and 69 of the Amended Complaint rely on  this document. See Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (stating that we may consider undisputedly authentic documents in connection with a motion to dismiss "if the complainant's claims are based upon [those] documents" (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).  We note that Plaintiffs did not dispute the authenticity of any of the Exhibits that Defendants ask us to consider in the context of the instant Motion.  (See generally Docket No. 26.)

quarter of 2024 and that "positive interim RAISE trial results would be adequate for regulatory filing purposes in RSE in the U.S." (Id.)

C.        Pre-Class Period Public Statements Regarding Marinus's Financial Condition

Defendants stated in Marinus's 2022 Form 10-K, which it filed with the SEC on March 9, 2023, that, on December 31, 2022, Marinus had cash and cash equivalents of $240.6 million, which they believed would "be sufficient to fund [its] operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under [its] debt facility, into the second half of 2024." (Id. ¶ 56 (emphasis omitted).) "Thus, in early 2023, Defendants projected that their cash would enable Marinus to complete the RAISE trial and announce topline results." (Id. ¶ 60.)

Marinus's Form 10-Q for the period ending March 31, 2023, reported that the Company believed that its "existing cash, cash equivalents and short-term investments as of March 31, 2023 will be sufficient to fund [its] operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under [its] debt facility, into the second half of 2024." (Id. ¶¶ 64-65.) Defendants reported in Marinus's Form 10-Q for the period ending June 30, 2023, that Marinus had "cash and cash equivalents of $175.3 million as of June 30, 2023," and stated that Marinus's "existing cash, cash equivalents and short-term investments as of June 30, 2023 will be sufficient to fund our operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under our debt facility, into the second half of 2024." (Id. ¶ 66.)

D.        Non-Public Information Regarding the Interim Analysis

"Unbeknownst to investors, Defendants forced the interim analysis because Marinus lacked sufficient cash to complete both the RAISE trial and the TrustTSC trial." (Id. ¶ 53.)

6

Defendants had known since mid-2022 that Marinus might not have sufficient cash to fully enroll and conduct both trials. (Id. ¶ 54.) Defendants therefore "obtained FDA approval for the interim analysis, in an all-or-nothing gamble they hid from investors." (Id.)

Prior to the Class Period, however, Senior Marinus biometricians had informed Defendants "that the probability of meeting the stopping criteria [in the interim analysis] was low, and that ceasing to enroll new patients materially short of 124 would likely disable the RAISE trial from showing statistical significance between IV ganaxolone and placebo for at least one of the two co-primary endpoints." (Id. ¶ 73.) These biometricians warned Defendants that Marinus should not "conduct the interim analysis of the RAISE Phase 3 trial and [should] instead to wait for the final analysis" but Defendants ignored their advice because Marinus did not have the funds to continue the RAISE Phase 3 trial beyond the interim analysis. (Id. ¶ 74.) Defendants did not share this information with investors. (Id.)

The Senior Vice President of Biometrics at Marinus from September 2020 to September 2024, referred to in the Amended Complaint as FE1, reported directly to Hulihan and supervised the "design, conduct, and analysis of clinical trials for regulatory approvals." (Id. ¶ 76.) FE1 and their team recommended to Hulihan that Marinus should not conduct the interim analysis of the RAISE trial because the interim analysis would require "a much higher bar to pass to reach statistical significance than would be needed if the company just waited for the fully-enrolled final analysis." (Id. ¶ 77.) Hulihan reported this information to Braunstein. (Id.) Hulihan rejected the recommendation made by FEI and their team and "told FEI that Marinus was going to stop the RAISE trial early, regardless of the results of the interim analysis," because Marinus did not have the funding to complete the RAISE trial. (Id. ¶ 78 (emphasis omitted).)

7

FE2, The Director of Clinical Development Operations for Marinus, identified in the Amended Compliant as FE2, "heard multiple Marinus employees discussing that Marinus had decided, pre-emptively, to stop the RAISE trial at the interim analysis regardless of the outcome due to financial reasons." (Id. ¶ 79.)  FE3, a Senior Clinical Trial Manager at Marinus from August 2023 to April 2024, who reported to FE2, stated that "George Laskaris, the Head of Data Management at Marinus, repeatedly told Defendants, including Hulihan . . . that there were serious data management and data integrity issues with the RAISE trial."[4]  (Id. ¶ 81.)  This "messy" data materially increased the risk that the differences in outcome between IV ganaxolone and the placebo would be harder to detect, but Marinus chose not to expend the considerable resources it would require to send data monitors to all RAISE trial sites to clean the data."  (Id.)  By January 2024, FE3 had heard Laskaris tell Hulihan over the phone about the problems with trial data integrity.  (Id. ¶ 82.)  Laskaris also told FE3 that management was not doing anything about the data management issues and that Hulihan and others had dismissed his reports about data integrity. (Id.)  Laskaris advised Marinus's management "not to do the interim analysis in the RAISE trial." (Id.)  Defendants' "expressions of confidence in the interim analysis and the Company's ability to finance the RAISE trial through completion . . . omitted that they determined not to complete the study and knew that the probability of achieving the stopping criteria was low."  (Id. ¶ 85.)

---

[4] The quality of the data generated is important to the outcome of a clinical trial.  (Id. ¶ 51.) "[B]est practices are adopted to ensure that data are complete, reliable, and processed correctly." (Id.)  High-quality data should be accurate and suitable for statistical analysis, meet protocol parameters and should have minimal or no missing data.  (Id. ¶ 52.)

E.    Defendant's Class Period Statements Regarding Marinus's Financial Status

1.    2023 Third Quarter Financial Results

On November 7, 2023, Marinus issued its Form 10-Q for the period ending September 30, 2023, and issued a press release with a business update and financial results for the third quarter of 2023. (Id. ¶¶ 86. 88.) The press release stated Marinus was "committed to successfully completing both the RAISE and TrustTSC trials in 2024 and [to] continue to make the investments to prepare for these commercial launches" (the "continuing to make the investments statement"). (Id. ¶ 86 (emphasis omitted).) The press release also reported that Marinus had "cash, cash equivalents and short-term investments of $176.4 million as of September 30, 2023," which was "sufficient to fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024." (Id.) The Form 10-Q stated that Defendants "anticipate[d] reaching the enrollment target for the interim analysis in the first quarter of 2024 with topline data . . . expected in the second quarter of 2024" and that Defendants believed that "positive interim RAISE trial results could be adequate for regulatory filing purposes in RSE." (Id. ¶ 88 (emphasis omitted).) The Form 10-Q also included Defendants' belief "that our existing cash, cash equivalents and short-term investments as of September 30, 2023, will be sufficient to fund our operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under our debt facility, for the one-year period after the date the financial statements are issued" (the "3Q 2023 10-Q financial statement"). (Id. ¶¶ 67, 89 (emphasis omitted).)

On November 7, 2023, Defendants held a conference call with investors to discuss the Company's third quarter of 2023 operations and results. (Id. ¶¶ 68, 91.) Braunstein said during

the call that "[t]he entire organization remains acutely focused on advancing our Phase III clinical trials in refractory status epilepticus and TSC," was "committed to successfully completing both the RAISE and TrustTSC trials in 2024," and was making the investments necessary to prepare for commercial launches. (Id. ¶¶ 68, 91 (emphasis omitted).) Braunstein also told investors that Marinus expected to enroll the number of patients into the RAISE trial that it needed for the interim analysis by the end of the first quarter of 2024. (Id.) Braunstein also said that Defendants "believe we have the appropriate resources required to complete 2 key data readouts and prepare for a bright future." (Id. ¶ 91 (emphasis omitted).) Braunstein also discussed the Phase 3 TrustTSC trial, stating that Defendants "believe we have laid a strong foundation for near and long-term growth and have prioritized fee programs and our cash runway accordingly." (Id. (emphasis omitted).) Braunstein further told investors that "[p]reparations are underway for an NDA filing, and we don't expect the additional delays to significantly impact the timing of our commercial launch." (Id. ¶¶ 68, 91.)

Hulihan gave prepared remarks regarding the interim analysis during that conference call. (Id. ¶ 93.) He stated that "[f]ollowing a successful interim analysis, we plan to begin transitioning the majority of RAISE sites to open-label enrollment and then shortly transition a subset of the sites to the RAISE II study" (the "RAISE II statement") (Id. (emphasis omitted).) Hulihan also told investors that he was very confident that the interim analysis was 94% powered to detect a 40% treatment difference and that they could see a statistical significance at a range of 25% (the "94% powered statement"). (Id. ¶ 95.) Braunstein added that, going into the trial, they thought that the placebo rate might be 30% or higher and in the trial they were seeing a much lower placebo rate, which they believed gave them "a lot more flexibility in terms of hitting statistical significance" (the "lower placebo rate statement"). (Id. (emphasis omitted).)

2.    Marinus's Fourth Quarter 2023 and 2023 Year End Results

On January 4, 2024, Defendants issued a press release concerning Marinus's preliminary fourth quarter 2023 and full year 2023 results.  (Id. ¶ 97.)  The press release stated that "the RAISE trial had enrolled over 90% of patients required for the interim analysis" and quoted Braunstein as saying "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated, beginning with topline data from the RAISE trial of IV ganaxolone in refractory status epilepticus in the second quarter followed by the TrustTSC study readout in tuberous sclerosis complex in the third quarter."  (Id.)  The press release also quotes Braunstein as stating that "[w]e have an opportunity to address significant unmet needs in patients with refractory seizure disorders and remain committed to developing potentially lifesaving treatments."  (Id. (alteration in original).)  The press release also reported "that Marinus had [p]reliminary unaudited cash, cash equivalents, and short-term investments of $150.3 million as of December 31, 2023" and that the Company expected its cash "to fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024" (the "January 4, 2024 press release statement").  (Id. ¶ 98 (alteration in original) (internal quotation marks omitted).)

Marinus's 2023 Form 10-K states that, on December 31, 2023, the company "had Cash and cash equivalents and Short-term investments of $150.3 million" and that this would be sufficient to fund Marinus's "operating expenses and capital expenditure requirements, as well as maintain the minimum cash balance required under [its] debt facility, into the fourth quarter of 2024."  (Id. ¶ 69.)  The 2023 Form 10-K also states that Marinus expected to announce top-line data for the TrustTSC trial in the fourth quarter of 2024, that the RAISE trial had reached its enrollment target for the interim analysis in the first quarter of 2024, and, if the pre-defined stopping criteria from

11

the planned interim analysis were met, Marinus expected to have its interim analysis with top-line data readout for the RAISE trial in the second quarter of 2024. (Id.)

On March 5, 2024, Defendants issued a press release concerning Marinus's operations and financial results for the fourth quarter of 2023 and year end 2023. The press release stated: "Phase 3 RAISE trial interim analysis enrollment target achieved with Data Monitoring Committee (DMC) review scheduled and topline results expected in first half of Q2 2024"[5] and that "Marinus was [t]argeting submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) in early 2025 with priority review expected" (the "March 5 press release statements"). (Id. ¶¶ 100, 102 (alteration in original) (internal quotation marks omitted).) Braunstein is quoted in the press release as saying "[w]e are thrilled to announce we have exceeded the enrollment threshold required to conduct an interim analysis in the Phase 3 RAISE trial in refractory status epilepticus." (Id. ¶ 100 (alteration in original).) He is also quoted as stating that Marinus was "on track to announce topline data in the second quarter, assuming efficacy criteria for the interim analysis are met." (Id.) The press release also stated that the Company's cash and cash equivalents of $150.3 million as of December 31, 2023, would be sufficient to fund the Company through the fourth quarter of 2024 (the March 5, 2024, press release financial statement"). (Id.)

Defendants held a conference call with investors on March 5, 2024, regarding the Company's operations and fiscal results for the fourth quarter of 2023 and the full year of 2023. (Id. ¶ 104.) During the call, Braunstein told investors that Marinus had met the enrollment criteria

---

[5] The FDA requires a Data Monitoring Committee ("DMC") in all clinical trials that assess new interventions. (Am. Compl. ¶ 33.) A DMC reviews data from the clinical trial and advises the sponsor about the safety of trial subjects and "the continuing validity and scientific merit of the trial." (Id.)

12

for the interim analysis in the RAISE trial and expected to announce the outcome of that analysis in the first half of the second quarter of 2024.  (Id.)    Hulihan also gave prepared remarks during the call, stating that Marinus "expect[ed] to report top line results [from the RAISE trial] in the second quarter of 2024" (the "March 5, 2024 topline results statement").  (Id. ¶ 106 (emphasis omitted).)  Hulihan also told investors that they should expect the following to occur next:  (1) "the data will be provided to the DMC for a determination of whether the studies met the pre-specified efficacy stopping boundaries on the co-primary endpoints[;]" (2) "[i]f the study achieves these pre-specified stopping rules, the Marinus leadership team will then evaluate the data and share top line results publicly soon thereafter[;]" and (3) if the results are successful, they will serve as the basis for a U.S. regulatory filing.  (Id.)  Pfanstiel told investors that Marinus "ended 2023 with cash, cash equivalents and short-term investments of 150.3 million" and that they "project a cash balance of greater than 100 million at the expected RSE readout."  (Id. ¶ 108.)  Hulihan also answered questions about the RAISE trial during the March 5, 2024, conference call, discussing the stopping criteria and stating that "[t]he analysis is very robust" and that they "have a lot of power at the interim analysis based on the 83 patients" (the "very robust analysis statement").  (Id. ¶ 110.)

> F.    The Results of the Interim Analysis of the RAISE Trial

Marinus issued a press release regarding the interim analysis before the market opened on April 15, 2024 (the "April 15 Announcement").  (Id. ¶ 112.)  The April 15 Announcement stated that "the RAISE Trial had not met early stopping criteria and that the Company would implement cost-saving measures."[6]  (Id.)    The April 15 Announcement further stated that the DMC

---

[6] Defendants disclosed the topline results for the RAISE trial in a June 17, 2024, press release.  (Id. ¶ 118.)  The trial involved 96 patients, "49 in the IV ganaxolone arm and 47 in the placebo arm."  (Id.)  The topline data showed that "[t]he trial met the first co-primary endpoint" in that "[a] statistically significant proportion of patients had status epilepticus cessation within 30 minutes of initiating IV ganaxolone compared to placebo:  80% vs. 13% respectively."  (Id.)  The

13

recommended continuing the RAISE trial after the interim analysis, but Marinus "decided to complete enrollment in the RAISE trial at approximately 100 patients with topline results expected in the summer of 2024." (Id. (emphasis omitted).) The April 15 Announcement also stated that "[t]hose results will be used to determine whether to continue development of IV ganaxolone." (Id.) The April 15 Announcement included a statement from Braunstein that Marinus would "evaluat[e] potential cost-saving strategies to provide the strongest capital position as we approach enrollment completion in the global Phase 3 Trust TSC trial." (Id.) The April 15 press release further stated that Marinus estimated that it had "cash, cash equivalents and short-term investments of $113.3 million as of March 31, 2024." (Id.) The April 15 Announcement concluded that "[c]ost reduction activities to extend the cash runway beyond the fourth quarter of 2024 are under review and are expected to be implemented in the current quarter." (Id. (emphasis omitted).) Marinus's stock price dropped 82.7% on April 15, 2024, from $6.22/share to close at $1.30/share. (Id. ¶ 113.) On April 16, 2024, the stock dropped to $1.20/share. (Id.)

On May 8, 2024, before the market opened, Marinus issued a press release that announced cost cutting measures including the following: (1) Marinus had stopped enrolling patients into the RAISE and RAISE II trials; (2) Marinus had deferred investment in IV ganaxolone manufacturing; (3) Marinus had reduced its workforce by 20%; and (4) Marinus had made additional cost reductions. (Id. ¶ 114.) The press release also stated that "Marinus has stopped the Phase 3 Raise II trial in RSE." (Id. ¶ 115 (emphasis omitted).) Plaintiffs and members of the putative Class have suffered significant losses and damages as a result of Defendants' wrongful activity and omissions and "the precipitous decline in the market value of the Company's common shares." (Id. ¶ 122.)

---

topline data also showed that the trial did not meet the second co-primary endpoint in that "RAISE failed to achieve statistical significance in the proportion of patients not progressing to IV anesthesia for 36 hours following initiation of IV ganaxolone compared to placebo." (Id.)

14

Plaintiff seeks to bring this action on behalf of "a class consisting of all persons other than defendants who acquired Marinus securities publicly traded on the NASDAQ during the class period, and who were damaged thereby (the "Class")."  (Id. ¶ 123.)  The Amended Complaint asserts two claims for relief on behalf of the Class:  (1) a claim for violation of Section 10(b) and Rule 10b-5 and (2) a claim for violation of Section 20(a).  Defendants have moved to dismiss both claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.     LEGAL STANDARD

When we apply Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).  "A complaint is properly dismissed for failing to state a claim 'if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that [the] plaintiff's claims lack facial plausibility.'" Talley v. Pillai, 116 F.4th 200, 206 (3d Cir. 2024) (alteration in original) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). "[W]e need not 'accept as true a legal conclusion couched as a factual allegation.'" Host Int'l, Inc. v. MarketPlace, PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (citation omitted).  The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 556 (2007)).  A complaint fails to allege a facially plausible claim if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level."  Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555).

"'By virtue of Civil Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), heightened pleading standards govern securities fraud claims brought under § 10(b) and Rule 10b-5.'"  Id. at 112 (quoting City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc., 70 F.4th 668, 680 (3d Cir. 2023)).  "Rule 9(b) requires parties 'alleging fraud or mistake' to 'state with particularity the circumstances constituting fraud or mistake,' a higher pleading standard than Rule 8."  Id. (quoting Fed. R. Civ. P. 9(b)).  Moreover "'any private action arising under this chapter,' including § 10(b) claims, is subject to the procedural requirements of the PSLRA."  Id. (quoting 15 U.S.C. § 78u-4).  The PSLRA requires that a securities fraud complaint alleging that a defendant made a false or misleading statement:  "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. (alteration in original) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007)).

## III.    DISCUSSION

"The Securities Exchange Act of 1934 Section 10(b), and regulations promulgated thereunder, prohibit fraud in connection with the sale or purchase of securities."  In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 277 (3d Cir. 2010) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5(b)).  The United States Court of Appeals for the Third Circuit has described the elements of a private action brought pursuant to Section 10(b) as:  "'(1) a *material misrepresentation (or omission),*' '(2)

16

*scienter, i.e.*, a wrongful state of mind,' '(3) *a connection with the purchase or sale of a security*,' '(4) *reliance*,' '(5*) economic loss*,' and '(6) "*loss causation,*" *i.e.*, a causal connection between the material misrepresentation and the loss.'" In re Walmart Inc. Sec. Litig., 151 F.4th 103, 113 (3d Cir. 2025) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). "'[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under [those] provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Id. (alterations in original) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 45 (2011)). "Omissions are actionable only when they render some other affirmative statement misleading." Id. (citing Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 264 (2024)).  Defendants argue that we should dismiss the Amended Complaint because it fails to plausibly allege any false or misleading statements, scienter, or loss causation.

A.    Material Misrepresentations or Omissions

Defendants argue generally that the Amended Complaint fails to allege any false statements with sufficient particularity because it does not clearly identify the allegedly false statements and the reasons why each such statement is false and misleading.  Defendants contend that the Amended Complaint merely quotes long paragraphs of their public statements and gives a laundry list of reasons why each such statement is false. See Smith v. Antares Pharma, Inc., Civ. A. No. 17-8945, 2019 WL 2785600, at *11 (D.N.J. July 2, 2019) (concluding that securities fraud complaint failed to satisfy the PSLRA's requirement that a complaint specify "'the reason or reasons why [a] statement is misleading . . .'" because the complaint often just included "a paragraph repeating the same conclusory statements" after each allegedly fraudulent statement, rather than provide specific reasons "why the statements were false or misleading" (quoting 15

U.S.C. § 78u-4(b)(1)(b)).  Plaintiffs maintain that the Amended Complaint sufficiently alleges misstatements regarding (1) the interim analysis of the RAISE trial; (2) Defendants' commitment to complete the RAISE trial; and (3) Marinus's cash position.

1.      Statements Regarding the RAISE Trial

Plaintiff maintains that the Amended Complaint sufficiently alleges that Hulihan and Braunstein made material misstatements regarding the RAISE trial during the November 7, 2023, conference call with analysts.  Plaintiff relies on Hulihan's 94% powered statement and Braunstein's lower placebo rate statement.  (See Am. Compl. ¶ 95.)  Plaintiff also contends that the Amended Complaint sufficiently alleges that Defendants' March 5, 2024, press release statements were material misstatements regarding the RAISE trial.  (See Am. Compl. ¶¶ 100, 102.) Plaintiff further argues that the Amended Complaint sufficiently alleges that Hulihan made similar material misstatements during the March 5, 2024, conference call with investors.  Plaintiff relies on the March 5, 2024 topline results statement and the March 5, 2024, very robust analysis statement.  (Id. ¶¶ 106, 110.)

Plaintiff argues that the Amended Complaint sufficiently alleges that these statements were misleading because it alleges that Defendants failed to disclose crucial facts regarding the subject matter of those statements, i.e., that two of Marinus's most senior employees had informed Defendants that Marinus should not conduct the interim analysis because it had a low probability of success due to the size of the interim analysis and because the data that would be used in the analysis was messy.  Plaintiff relies on allegations related to FE1 and FE2 to support his argument that the Amended Complaint alleges that Defendants made material omissions with respect to the low probability that the RAISE trial would be successful at the interim analysis.  As we discussed above, the Amended Complaint alleges that FE1 told Hulihan, months before Marinus started the

18

interim analysis of the RAISE trial, that Marinus should not conduct the interim analysis because there would be a higher bar for the interim analysis "to pass to reach statistical significance than would be needed if the company just waited for the fully-enrolled final analysis."  (Id. ¶ 77.)  The Amended Complaint also alleges that Hulihan rejected FE1's recommendation and "told FE1 that Marinus was going to stop the RAISE trial early, regardless of the results of the interim analysis" because "Marinus did not have the funding to complete the RAISE trial."  (Id. ¶ 78 (emphasis omitted).)   The Amended Complaint further alleges that in 2023, Hulihan passed FE1's recommendation on to Braunstein, who approved the decision to stop the RAISE trial after the interim analysis was completed despite FE1's recommendation.  (Id. ¶¶ 77-78.)  Plaintiff also relies on allegations that FE2 reported hearing "multiple Marinus employees discussing that Marinus had decided, pre-emptively, to stop the RAISE trial at the interim analysis regardless of the outcome due to financial reasons."  (Id. ¶ 79.)

Plaintiff relies on allegations related to FE3 to support his argument that the Amended Complaint sufficiently alleges that Defendants made material omissions with regard to the quality of the data generated in the RAISE trial.  As we mentioned above, the Amended Complaint alleges that  FE3 reported that "George Laskaris, the Head of Data Management at Marinus, repeatedly told Defendants, including Hulihan, that there were serious data management and data integrity issues with the RAISE trial."  (Id. ¶ 81.)  The "messy" data is alleged to have created "a materially increased risk of variability, rendering differences in outcome between IV ganaxolone and placebo harder to detect" and Marinus should have "expend[ed] considerable resources to send data monitors to all RAISE trial sites to clean the data to ensure uniformity."  (Id. )  The Amended Complaint further alleges that, in January 2024, FE3 heard Laskaris tell Hulihan "about the problems with the trial data integrity during a phone call."  (Id.¶ 82.)  In addition, Laskaris "told

19

FE3 that management was not listening or doing anything about the data management issues, and that his reports about data integrity were dismissed by Hulihan and others." (Id.)

We find that the Amended Complaint clearly identifies the statements that Plaintiff contends were false regarding the interim analysis, i.e., Hulihan's 94% powered statement, the lower placebo rate statement, the March 5, 2024, press release statements, the March 5, 2024 topline results statement, and the March 5, 2024, very robust analysis statement. (See Am. Compl. ¶¶ 95, 100, 102, 106, 110.) We also find that the Amended Complaint clearly identifies the reasons why these statements were false and misleading, i.e., because Defendants failed to publicly disclose the information provided to Defendants by FE1, FE2, and FE3. (See id. ¶¶ 77-79, 81.) Accordingly, we deny the Motion to Dismiss with respect to Defendants' argument that the allegations that they made material misstatements regarding the interim analysis are insufficiently specific.

a.      Market Awareness

Defendants also argue we should dismiss Plaintiff's allegation that they made material misstatements regarding the interim analysis of the RAISE trial because the market was aware of the allegedly omitted information regarding its plan to terminate the RAISE trial after the interim analysis. See Anderson v. Stonemor Partners, L.P., 296 F. Supp. 3d 693, 703 (E.D. Pa. 2017) (determining that complaint did not sufficiently plead a material omission or misstatement because the defendant had "disclosed all of the information that Plaintiffs allege it concealed, and a reasonable investor would account for the disclosed information"), aff'd sub nom. Fan v. StoneMor Partners LP, 927 F.3d 710 (3d Cir. 2019). Defendants rely on Marinus's 2022 Form 10-K, which states that "[c]linical trials may be delayed, suspended or prematurely terminated for a variety of reasons, such as . . . ambiguous or negative interim results . . .," the "failure of a product candidate

to demonstrate any or enough of a benefit," or the "lack of adequate funding to continue the clinical trial . . . ."[7] (Defs. Ex. D at 16-17.)   Defendants also rely on Marinus's 2023 Form 10-K, which incorporates identical warning language.   (See Defs. Ex. L at 13-14.)   Marinus also included specific warnings regarding one of the two co-primary endpoints for the RAISE trial in both its 2022 and 2023 Form 10-Ks.   Specifically, those documents both state that "the clinical trial endpoints of the RAISE trial are based on treatment outcomes, including initiation of anesthesia for treatment of RSE.   Practice variability in the use of anesthesia for SE treatment could adversely impact the ability to show a treatment effect with ganaxolone."  (Defs. Ex. D at 12, Ex. L at 9.) Marinus further relies on three analyst reports that state that Marinus intended to end the RAISE trial early.[8]   (See Defs. Exs. N, P, Q.)   RBC Capital Markets reported on March 5, 2024, that

_____

[7] We may consider Marinus's 2022 in the context of this Motion to Dismiss because Plaintiff does not dispute the authenticity of this document and paragraphs 36, 37, 56, 61, 62, and 70 of the Amended Complaint rely on this document.  See Alpizar-Fallas, 908 F.3d at 914.

[8] We may take judicial notice of analyst reports only for the limited purpose of noting that they were published.  See In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 391 (D.N.J. 2010) (stating that "the opinions of analysts or reporters cannot be noticed for the truth of the matter stated therein: only the fact that these opinions were published can be noticed").

Defendants also ask us to consider what it contends are statements made by Braunstein regarding ganaxolone and the RAISE trial during three conferences.  Defendants have submitted what they contend are transcripts of these conferences.  (See Defs. Exs. E, I, and O.)  None of these transcripts, or the statements reflected therein, are relied upon in the Amended Complaint. Defendants recognize that these are not the types of documents that we can ordinarily rely upon in the context of a Motion to Dismiss, so they ask us to take judicial notice of these transcripts.  They have not, however, provided us with any authority for the proposition that we may take judicial notice of these particular transcripts.  "Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are 'not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"  In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (alteration in original) (quoting Fed. R. E. 201(b)).  The statements which Defendants rely on that are contained in these transcripts submitted are not facts that are "generally known" and Defendants have not identified any sources through which we could determine the accuracy of these transcripts.  Indeed, all three transcripts contain disclaimers as to their accuracy.  (Defs. Exs. E at 8-9, I at 9, O at 12.) Accordingly, we decline to take judicial notice of Defendants' Exhibits E, I and O, and we do not

21

Marinus had enrolled 83 patients in the RAISE trial as of the end of January 2024 and that RBC Capital had "reaffirmed with [management] that [Marinus] will likely stop enrolling [patients] voluntarily if DSMB recommends continued enrollment." (Def. Ex. N at 1.)  On March 11, 2024, Leerink Partners reported that it had spoken with Braunstein at its Global Biopharma Conference and that "[i]f the stopping criteria [for the RAISE trial] are not met, the company wouldn't continue to enroll patients in the RAISE trial." (Def. Ex. P at 1.)  On March 25, 2024, Cantor Fitzgerald said that, based on the interim analysis, management would stop new enrollment in the RAISE trial to engage in a more thorough analysis of the existing data. (Def. Ex. Q at 2.)

The facts that are alleged in the Amended Complaint to be material omissions are not, however, the same as the facts that Defendants contend were disclosed in Marinus's 2022 and 2023 Form 10Ks and mentioned in the three cited analyst reports.  Defendants disclosed in the Form 10-Ks that clinical trials may be terminated early for reasons such as negative interim results, the failure of the tested drug to demonstrate sufficient benefit, or the lack of funding to continue the trial, and that the results of the trials could be affected by the use of anesthesia for treatment of RSE.    (Defs. Ex. D at 12, 16-17, Ex. L at 9. 13-14.)  The analyst reports show only that some analysts understood that Marinus would stop enrolling patients in the RAISE trial if the trial did not meet the early stopping criteria. (Def. Ex. N at 1, Ex. P at 1, Ex. Q at 2.)  However, none of this information is the information that the Amended Complaint alleges was omitted, i.e., (1) that senior employees of Marinus had advised Defendants not to conduct the interim analysis, explaining that there was a low probability that RAISE trial would achieve the stopping criteria for the interim analysis because it was underpowered and the data was messy, and (2) that Marinus

_____

consider the statements attributed to Braunstein in these documents in the context of the instant Motion.

intended to stop the RAISE trial regardless of the results of the interim analysis due to financial problems.  (See Am. Compl. ¶¶ 76-78, 80-83, 85.)  Accordingly, we deny the Motion to Dismiss with respect to Defendants' argument that their statements regarding the interim analysis of the RAISE trial were not false because the market was aware of the allegedly omitted information. See Anderson, 296 F. Supp. 3d at 703.

        b.        Vagueness

Defendants argue that the alleged omission of information relating to Laskarsis's recommendation regarding the messiness of the RAISE trial data is not actionable because that allegation is too vague.  Under Rule 9(b) and the PSLRA, "Plaintiffs 'may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.'"  Kumar v. Kulicke & Soffa Indus., Inc., Civ. A. No. 19-0362, 2019 WL 5081896, at *4 (E.D. Pa. Oct. 9, 2019) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 224 (3d Cir. 2002)).  Defendants contend that the Amended Complaint's allegations regarding messy data are too vague because the Amended Complaint does not allege the manner in which the messy data affected the results of the interim analysis. However, as we discussed above, the Amended Complaint specifically alleges that "messy" data created "a materially increased risk of variability, rendering differences in outcome between IV ganaxolone and placebo harder to detect" and that Marinus would be required "to expend considerable resources to send data monitors to all RAISE trial sites to clean the data to ensure uniformity."  (Id. ¶ 81.) We find that the Amended Complaint specifically alleges how the "messy" data would likely compromise the results of the interim analysis and we deny the Motion to Dismiss with respect to this argument.

23

c.        Disclosures With Respect to the Interim Analysis

Defendants also argue that they were not obligated to disclose that the interim analysis had a "low probability of success" or that a senior biostatistician working for Marinus recommended that Marinus avoid doing the interim analysis because the investing public is aware that drug trials can fail and that "trading in the shares of companies whose financial fortunes may turn on the outcome of such experimental drug trials inherently carries more risk than some other investments." N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 48 (1st Cir. 2008)).   However, this generalized statement regarding the risks of some types of investments does not address the specific omissions alleged in the Amended Complaint. Defendants also maintain that they were not obligated to disclose their senior biometrician's pessimism, because "'general positive statements do not give rise to a duty to disclose the details of internal corporate disputes.'" Winer Fam. Tr. v. Queen, Civ. A. No. 03-4318, 2004 WL 2203709, at *8 (E.D. Pa. Sept. 27, 2004) (quoting Kane v. Madge Networks N .V., Civ. A. No. 96-20652, 2000 WL 33208116, at *9 (N.D. Cal. May 26, 2000)), aff'd, 503 F.3d 319 (3d Cir. 2007),).

Plaintiffs maintain that Defendants' omissions of concerns regarding the low probability that the interim analysis of the RAISE trial would be successful and omission of the senior biometrician's concern about the messy data are actionable.  Plaintiffs rely on Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175 (2015), in which the Supreme Court noted that omissions regarding a statement of opinion may be actionable "if those facts conflict with what a reasonable investor would take from the [opinion] statement  itself." Id. at 189.  The Supreme Court further noted that "[a]n opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Id. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts;

24

indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." Id. at 189-90. Indeed, "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." Id. at 190. Plaintiffs rely on an example given by the Court to demonstrate when an omission may be actionable. The Omnicare Court "[c]onsider[ed] an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful'" and noted that such a statement could be "misleadingly incomplete" "[i]f the issuer ma[de] that statement without having consulted a lawyer," or if "the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view." Id. at 188. The Omnicare court did, however, note that an omission of contrary legal advice given by a "single junior attorney . . . when six of his more senior colleagues gave a stamp of approval . . . would not make the statement of opinion misleading." Id. at 190.

We find that the alleged undisclosed facts concerning the information that senior Marinus employees provided by to Defendants regarding the power of the interim analysis and the messiness of the trial data are similar to the actionable omissions in the example discussed in Omnicare because this information came from very senior employees with knowledge of the subject matter of Defendants' statements, i.e., whether the interim analysis would be robust, whether the interim analysis was well powered, and whether Marinus could be expected to submit and NDA to the FDA in early 2025. We also find that these statements are similar to the statements found to be actionable in Tomaszewski v. Trevena, Inc., 482 F. Supp. 3d 317 (E.D. Pa. 2020). The Tomaszewski court found that the complaint in that case adequately alleged that a statement made by a pharmaceutical company executive was misleading where the executive stated that "[w]e expect the data from our Phase III pivotal efficacy studies in the first quarter of 2017 with an NDA

25

submission in the second half of 2017" and further stated that the company hoped to "get this important new drug to patients quickly" but the executive omitted that the proposed "NDA would be deficient because . . . [the company's] studies were using endpoints already rejected by the FDA" and the defendant knew that the statements were deficient for other reasons. Id. at 330-31 (citations omitted)). We therefore deny the Motion to Dismiss with respect to Defendants' argument that they were under no obligation to disclose the allegedly omitted facts regarding the interim analysis because we find that the Amended Complaint adequately alleges that there was such an obligation.

### 2.    Marinus's Financial Condition

Plaintiff contends that the Amended Complaint sufficiently alleges that Defendants made material misrepresentations regarding Marinus's financial condition. Plaintiff relies on the "continuing to make the investments statement" and argues that the Amended Complaint sufficiently alleges that this statement was false because it also alleges that, prior to November 7, 2023, Hulihan told FE1 that "Marinus did not have the funding to complete the RAISE trial," that the company would stop the trial for financial reasons, and that Braunstein approved the decision to stop the RAISE trial for financial reasons. (Id. ¶ 78.)

Plaintiff also relies on statements made by Braunstein in the November 7, 2023, conference call regarding Marinus's results for the Third Quarter of 2023. Braunstein told investors during that call that "with the success of ZTALMY, the recent extension of our cash runway into Q4 2024 and tightening of our spend to focus on our most valuable market opportunities, we believe we have the appropriate resources required to complete 2 key data readouts and prepare for a bright future" (the "success of ZTALMY statement"). (Id. ¶ 91 (emphasis omitted).) Plaintiff also relies on the 3Q 2023 10-Q financial statement, the January 4, 2024, press release statement, and the

March 5, 2024, press release financial statement. (Id. ¶¶ 89, 98, 102.) We find that the Amended Complaint clearly identifies the statements that Plaintiff contends were false regarding Marinus's financial condition. We also find that the Amended Complaint clearly identifies the reasons why these statements were false and misleading, i.e., because Defendants failed to publicly disclose that prior to November 7, 2023, Hulihan told FE1 that "Marinus did not have the funding to complete the RAISE trial," that the company would stop the trial for financial reasons, and that Braunstein approved the decision to stop the RAISE trial for financial reasons. (Id. ¶ 78.) Therefore, we deny the Motion to Dismiss with respect to Defendants' argument that the Amended Complaint fails to allege these false statements with sufficient particularity.

Defendants also argue that these statements regarding Marinus's financial condition are shielded from liability under the PSLRA's "safe harbor" provision as forward-looking statements expressing a belief that Marinus would have sufficient resources. "[T]he PSLRA provides a so-called 'safe harbor' that immunizes certain 'forward-looking' statements from § 10(b) liability. OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 490 (3d Cir. 2016). "That immunity applies if either the 'forward-looking statement is . . . identified as [such], and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement' or the plaintiff fails to prove the forward-looking statement 'was made with actual knowledge by [the speaker] that the statement was false or misleading. . . .'" Id. (alterations in original) (quoting 15 U.S.C. § 78u-5(c)) Forward-looking statements are defined by the PSLRA to include the following:

> statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial

27

condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition.

Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009) (quoting 15 U.S.C. § 78u–5(i)(1)(A)-(C); 15 U.S.C. § 78u–5(i)(1)(D)).  The safe harbor applies if "'meaningful cautionary statements'" are used "regarding the forward-looking statement." OFI Asset Mgmt., 834 F.3d at 491 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(I)).  "'[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [documents] which the plaintiffs challenge.'"  Id. (alterations in original) (quoting GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir. 2004)).  "However, even in the absence of such meaningful cautionary language," the safe harbor would also apply "to 'immunize[] from liability any forward looking statement [if] . . . the plaintiff fails to show the statement was made with actual knowledge of its falsehood.'"  Id. (alterations in original) (quoting Avaya, 564 F.3d at 254).  "Thus, any forward-looking statement is protected if it is either accompanied by 'substantive and tailored' cautionary statements or if the plaintiff fails to show 'actual knowledge of falsehood.'"  Id.

Plaintiffs argue that the continuing to make the investments statement, the success of ZTALMY statement, the 3Q 2023 10-Q financial statement, the January 4, 2024, press release statement, and the March 5, 2024, press release financial statement are not forward-looking statements because they merely state present facts regarding Marinus's cash on hand.  (See Am. Compl. ¶¶ 86, 89, 91 98, 102).)  Nonetheless, we find that the continuing to make the investments statement, the 3Q 2023 10-Q financial statement, and the success of ZTALMY statement are forward looking, as they concern both Marinus's plans and objectives with respect to the RAISE

28

and TrustTSC Trials and statements of "future economic performance," i.e., whether Marinus's cash and cash equivalents would be sufficient to fund its operations in the future, including completing the RAISE and TrustTSC trials. See Avaya, 564 F.3d at 255 (quotations omitted). The January 4, 2024, press release statement and the March 5, 2024, press release financial statement, however, are mixed present/future statements, because they concern both references to Marninus's then current financial situation and Defendants' expectations concerning whether Marinus had the cash to fund its future operations. "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." Id. (alteration in original) (quotation and citation omitted).

Defendants argue that these statements are entitled to safe harbor because they were accompanied by meaningful cautionary language. Defendants rely on Marinus's November 7, 2023, Form 8-K, which includes a copy of the press release in which the continuing to make the investments statement appears.[9] (Compare Am. Compl. ¶ 86 and Defs. Ex. F at 4.) This press release states that forward-looking statements contained in the press release "reflect[] the current beliefs and expectations of management made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995." (Defs. Ex. F at 8.) The press release also contains the following language: "[f]orward-looking statements in this press release involve substantial risks and uncertainties that could cause our clinical development programs, future results, performance or achievements to differ significantly from those expressed or implied by the forward-looking statements" for a long list of reasons, including uncertainties and delays in the company's clinical

---

[9] We may consider Marinus's November 7, 2023 Form 8-K (Defs. Ex. F), the transcript of the November 7, 2023 conference call (Defs. Ex. H), and Marinus's January 4, 2024 Form 8-K (Defs. Ex. J) in connection with this Motion to Dismiss because Plaintiff does not dispute the authenticity of these documents and paragraphs 86, 91, and 98 of the Amended Complaint rely on these documents. See Alpizar-Fallas, 908 F.3d at 914.

29

trials and that "clinical trial results may not support regulatory approval." (Id. at 9.)  The press release also states that other risks are described in Marinus's Form 10-Ks, Form 10-Qs, and Form 8-Ks.[10]  (Id.)  We find that the continuing to make the investments statement is sufficiently identified as a forward-looking statement in Marinus's November 7, 2023, press release and that the press release contains meaningful cautionary language with respect to the subject matter of this statement.  We therefore conclude that this statement, on which Plaintiff relies in paragraph 86 of the Amended  Complaint, is immunized by the safe harbor provision of the PSLRA.  See Avaya, 564 F.3d at 254.

Defendants also rely on a transcript of the November 7, 2023, conference call, which contains the success of ZTALMY statement.  (Compare Am. Compl. ¶ 91 and Defs. Ex. H at 5.) The transcript also includes a preliminary statement by Sonya Weigle, Marinus's Senior Vice President of Investor Relations, Human Resources, and Corporate Affairs, who said that "some of the statements we are making today are forward-looking statements under the securities laws" which "involve substantial risks and uncertainties that could cause our clinical development programs, future results, performance or achievements to differ significantly from those expressed or implied by such forward-looking statements." (Defs. Ex. H at 4.)  Ms. Weigle is further recorded as saying that those "risks and uncertainties and risks associated with [Marinus's] business are described in the company's reports filed with the Securities and Exchange Commission, including Form 10-K, 10-Q and 8-K." (Id.)  We find that the success of ZTALMY statement was sufficiently identified as a forward-looking statement by Ms. Weigle and that Ms. Weigle's remarks contain

---

[10] Marinus's 2022 and 2023 Form 10-Ks both state that Marinus's financial "assumptions . . . may prove to be wrong," that the company could "exhaust our available capital resources sooner than we currently expect," and that the company "will need to secure additional funding in the future . . . to carry out all of our commercialization and planned research and development activities with respect to ganaxolone." (Defs. Exs. D at 10, 21; L at 6, 18.)

meaningful cautionary language with respect to the subject matter of this statement. We therefore conclude that Braunstein's success of ZTALMY statement, on which Plaintiff relies paragraph 91 of the Amended Complaint, is immunized by the safe harbor provision of the PSLRA. See Avaya, 564 F.3d at 254.

Defendants further rely on Marinus's January 4, 2024, Form 8-K, which attaches the January 4, 2024, press release statement. (Compare Am. Compl. ¶ 98 and Defs. Ex. J at 5.) The January 4, 2024, press release attached to the 8-K specifically identifies language regarding Marnus's expectations of its financial projections and financial position as "forward-looking statements reflecting the current beliefs and expectations of management made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995." (Id. at 5-6.) The press release further identifies possible risks and uncertainties that could cause Marinus's "future results, performance or achievements to differ significantly from those expressed or implied by the forward-looking statements" including uncertainties and delays related to the company's clinical trials, and states that "clinical trial results may not support regulatory approval." (Id. at 6.) The press release also states that other risks are described in Marinus's Form 10-Ks, Form 10-Qs, and Form 8-Ks. (Id.; see also n.10 supra.) We find that the January 4, 2024, press release statement is sufficiently identified as a forward-looking statement in the press release attached to Marinus's January 4, 2024, Form 8-K and that the press release contains meaningful cautionary language with respect to the subject matter of that statement. We therefore conclude that the forward-looking portion of this statement, on which Plaintiff relies in paragraph 98 of the Amended Complaint, is immunized by the safe harbor provision of the PSLRA. See Avaya, 564 F.3d at 254.

While Defendants include paragraph 89 among the paragraphs of the Amended Complaint that they contend allege statements that are protected by the safe harbor, Defendants do not

31

specifically argue that the 3Q 2023 10-Q financial statement, which is quoted in paragraph 89 of the Amended Complaint, is protected by the safe harbor.  Defendants have submitted portions of Marinus's Third Quarter 2023 10-Q.[11]  (See Defs. Ex. G.)  However, the document submitted by Defendants does not contain any discussion of forward-looking statements or any cautionary language regarding the subject matter of the 3Q2023 10-Q financial statement.  We conclude, accordingly, that Defendants have not shown that the 3Q 2023 10-Q financial statement is protected by the safe harbor provision of the PSLRA.

Defendants have also submitted Marinus's March 5, 2024, Form 8-K, which attaches the company's March 5, 2024, press release, including the March 5, 2024 press release statement. statement.  (Compare Am. Compl. ¶ 102 and Defs. Ex. K at 5.)  This press release, however, does not identify the March 5, 2024 press release statement as a forward-looking statement or contain any cautionary language related to the subject matter of that statement.  We conclude, accordingly, that this statement is not immunized by the safe harbor provision of the PSLRA.

In summary, we grant the Motion to Dismiss with respect to Defendants' argument that the continuing to make the investments statement, the success of ZTALMY statement, and the January 4, 2024, press release statement are protected by the safe harbor provision of the PSLRA (Am. Compl. ¶¶ 86, 91, 98), and we deny the Motion with respect to Defendants' argument that 3Q 2023 financial statement and the March 5, 2024, press release statement are immunized by the safe harbor.  (Am. Compl. ¶¶ 89 and 102).

---

[11] We may consider Marinus's November 7, 2023 Form 10-Q in the context of this Motion to Dismiss because Plaintiffs do not dispute the authenticity of this document and paragraphs 21, and 88 of the Amended Complaint rely on Marinus's 2023 Form 10-Q.  See  Alpizar-Fallas, 908 F.3d at 914.  We may also consider Marinus's March 5, 2024 Form 8-K (Defs. Ex. K) in the context of this Motion because Plaintiffs do not contest the authenticity of this document and paragraphs 100-02 of the Amended Complaint discuss the press release that is attached to this Form 8-K.  See Alpizar-Fallas, 908 F.3d at 914.

3.      Marinus's Commitment to Completing the Phase 3 Trials

Defendants also ask us to dismiss certain allegations of the Amended Complaint, in which Defendants are described as falsely asserting that Marinus was committed to completing the RAISE and TrustTSC trials and developing the drugs being tested in those trials.  Defendants specifically address the following allegations:  (1) Braunstein's statement in Marinus's January 4, 2024, press release that "[w]e have an opportunity to address significant unmet needs in patients with refractory seizure disorders and remain committed to developing potentially lifesaving treatments" (Am. Compl. ¶ 97 (alteration in original)); (2) Braunstein's statement in the same press release that "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated, beginning with topline data from the RAISE trial of IV ganaxolone in refractory status epilepticus in the second quarter followed by the TrustTSC study readout in tuberous sclerosis complex in the third quarter" (id.);   (3) Braunstein's statement during the November 7, 2023, conference call with investors that Marinus was "committed to successfully completing both the RAISE and TrustTSC trials in 2024" (id. ¶ 91); (4) Braunstein's statement during the same conference call that "[w]ith several key readouts in 2024, we believe we have laid a strong foundation for near and long-term growth (id. (emphasis omitted));  and (5) Braunstein's statement in the November 7, 2023 press release that Marinus "remain[ed] acutely focused on advancing our Phase 3 clinical trials in refractory status epilepticus and tuberous sclerosis complex" (id. ¶ 86).

Viewing the allegations of the Amended Complaint in the light most favorable to Plaintiff, we find that the Amended Complaint clearly identifies the statements that Plaintiff contends were false regarding Marinus's commitment to completing the two Phase 3 trials and developing the drugs being tested in those trials.  We also find that the Amended Complaint clearly identifies the

33

reasons why these statements were false and misleading, i.e., because Defendants failed to publicly disclose that prior to November 7, 2023, Hulihan told FE1 that "Marinus did not have the funding to complete the RAISE trial," that the company would stop the trial for financial reasons, and that Braunstein approved the decision to stop the RAISE trial for financial reasons.  (Id. ¶ 78.) Therefore, we deny the Motion to Dismiss to the extent that Defendants argue that the Amended Complaint fails to allege these false statements with sufficient particularity.

Defendants also argue that we should dismiss the Amended Complaint to the extent that it relies on these statements because these statements are merely inactionable "puffery." See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 n.12 (3d Cir. 1992) (determining that a statement that the defendant "looks to the future with great optimism" is "inactionable puffing").  Thus, "[m]aterial representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which constitute no more than 'puffery' and are understood by reasonable investors as such." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000) (quotation omitted); see also Fan, 927 F.3d at 716 (stating that "vague and general statements of optimism are non-actionable precisely because they are not material—a reasonable investor would not base decisions on such statements" (quotation omitted)).  "But, 'when a company repeatedly addresses a certain subject, the company declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.'" In re Five Below, Inc. Sec. Litig., Civ. A. No. 24-3638, 2025 WL 2447794, at *4 (E.D. Pa. Aug. 25, 2025) (quoting Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP, 532 F. Supp. 3d 189, 217 (E.D. Pa. 2021)).  "For example, when energy company executives affirmatively touted their commitment to and prioritization of safety, they 'themselves

34

. . . made the subject of safety material.'" Id. (alteration in original) (quoting Allegheny Cnty., 532 F. Supp. 3d at 218).

Viewing these allegations (Am. Compl. ¶¶ 86, 91, 97) in the light most favorable to Plaintiff, we conclude that the statements alleged in those paragraphs related to Marinus's commitment to completing the Phase 3 RAISE and TrustTSC trials and developing the drugs being tested in those trials, read in context, are not mere puffery, but explain the basis of the speaker's optimism and, may, at this stage of the litigation, be considered to be material. We therefore deny the Motion to Dismiss with respect to this argument.

### 4. Other Forward-Looking Statements

Defendants also argue that certain statements alleged in the Amended Complaint to be false regarding Marinus's expectations of the interim analysis are forward-looking statements that are immunized by the safe harbor. Defendant makes this argument with respect to a statement in Marinus's Third Quarter 2023 10-Q that Marinus "anticipate[s] reaching the enrollment target for the interim analysis in the first quarter of 2024 with topline data . . . expected in the second quarter of 2024" (Am. Compl. ¶ 88); the March 5, 2024 topline results statement (id. ¶ 106); and a statement in Marinus's March 5, 2024 press release that Marinus "expect[ed] approximately 100 patients to be randomized by the conclusion of the interim analysis" (id. ¶ 102). We have already found that the Amended Complaint clearly identifies the March 5, 2024 topline results statement as a false statement and clearly identifies the reasons why this statement is false and misleading, i.e., because Defendants failed to publicly disclose the information provided to Defendants by FE1, FE2, and FE3. We also find that the Amended Complaint clearly identifies both the statement in Marinus's Third Quarter 2023 10-Q that the company "anticipate[s] reaching the enrollment target for the interim analysis in the first quarter of 2024 with topline data . . . expected in the second

35

quarter of 2024" (id. ¶ 88) and the statement in Marinus's March 5, 2024, press release that Marinus "expect[ed] approximately 100 patients to be randomized by the conclusion of the interim analysis" (id. ¶ 102) to be false and that the Amended Complaint clearly identifies the reasons why these statements are false and misleading, i.e., because Defendants failed to disclose the information provided to them by FE1 FE2, and FE3. Accordingly, we deny the Motion to Dismiss to the extent that Defendants argue that these allegations are insufficiently specific.

As we discussed above, Defendants have submitted excerpts from Marinus's Third Quarter 2023 10-Q. The document submitted by Defendants does not, however, identify the statement that the company "anticipate[s] reaching the enrollment target for the interim analysis in the first quarter of 2024 with topline data . . . expected in the second quarter of 2024" (id. ¶ 88) as a forward-looking statement. (See Defs. Ex. G.) Moreover, this document also does not contain any meaningful cautionary language related to the subject matter of this statement. (See id.) We conclude, accordingly, that this statement is not protected by the safe harbor provision of the PSLRA.

As we have also discussed above, Defendants have submitted Marinus's March 5, 2024, Form 8-K, which attaches the company's March 5, 2024, press release. (Defs. Ex. K.) That press release includes the statement that Marinus "expect[ed] approximately 100 patients to be randomized by the conclusion of the interim analysis." (Compare Am. Compl. ¶ 102 and Defs. Ex. K). This press release, however, does not identify this statement as a forward-looking statement or contain any cautionary language related to the subject matter of this statement. (See Defs. Ex. K.) We conclude, accordingly, that this statement is not immunized by the safe harbor provision of the PSLRA.

Defendants also argue that the March 5, 2024 topline results statement, is immunized by the safe harbor because the transcript of the March 5, 2024 conference call shows that this statement was identified as forward looking and accompanied by meaningful cautionary language.[12]   (See Defs. Ex. M.)  The transcript of the March 5, 2024 conference call includes a preliminary statement by Weigle, who said that "some of the statements we are making today are forward-looking statements" which "involve substantial risks and uncertainties that could cause our clinical development programs, future results, performance or achievements to differ significantly from those expressed or implied by such forward-looking statements."  (Id. at 4.) Weigle is further recorded as saying that those "risks and uncertainties and risks associated with [Marinus's] business are described in the company's reports filed with the Securities and Exchange Commission, including Form 10-K, 10-Q and 8-K."  (Id.)  We find that the March 5, 2024 topline results statement was sufficiently identified as a forward-looking statement by Weigle and that Weigle's remarks contain meaningful cautionary language with respect to the subject matter of this statement.   We therefore conclude that the March 5, 2024 topline results statement, on which Plaintiff relies in paragraph 106 of the Amended Complaint, is immunized by the safe harbor provision of the PSLRA.  See Avaya, 564 F.3d at 254.

Defendants also argue that two additional statements regarding when Marinus anticipated Phase 3 data readouts are immunized by the safe harbor.  The first of these is alleged to be a statement by Braunstein that Marinus "ha[d] the appropriate resources required by complete 2 key data readouts."  (Am. Compl. ¶ 91.)  This is part of the success of ZTALMY statement, which we

---

[12] We may consider the transcript of the March 5, 2024 conference call (Defs. Ex. M.) because  Plaintiff does not dispute the authenticity of this document and paragraphs 104 and 106 rely on this document.  See Alpizar-Fallas, 908 F.3d at 914.

have found is immunized by the safe harbor.  The second is the following statement attributed to Braunstein in the January 4, 2024, press release:  "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated."  (Am. Compl. ¶ 97.)  The Amended Complaint alleges that the following statement was attributed to Braunstein in the January 4, 2024 press release:  The January 4, 2024, press release, which is attached to Marinus's January 4, 2024 Form 8-K and submitted by Defendants as Exhibit J, identifies statements using terms such as "expect" as forward-looking statements "made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995" and also contains meaningful cautionary language with respect to the subject matter of Braunstein's statement.  (See Defs. Ex. J at 5-6.)  Accordingly, we conclude that the statement alleged in paragraph 97 of the Amended Complaint as having appeared in Marinus's January 4, 2024, press release regarding performing two Phase 3 data readouts in 2024 is immunized by the safe harbor provision of the PSLRA.  See Avaya, 564 F.3d at 254.

Defendants also contend that two statements alleged to have been made by Hulihan during the November 7, 2023, conference call are immunized by the safe harbor.  The first is the RAISE II statement and the second is a statement that Marinus "anticipate[d] enrolling the first patients in RAISE II prior to the end of the year."  (Am. Compl. ¶ 93.)  As we discussed above, Weigle commenced that conference call by notifying participants that "some of the statements we are making today are forward-looking statements under the securities laws" and that those "forward-looking statements involve substantial risks and uncertainties," which "are described in the Company's Form 10-Ks, 10-Qs, and 8-Ks."  (Defs. Ex. H at 4.)  We therefore conclude that these statements, relied on by Plaintiff in paragraph 93 of the Amended Complaint, are identified as forward looking and accompanied by meaningful cautionary language and are therefore immunized by the safe harbor provision of the PSLRA.  See Avaya, 564 F.3d at 254.  We therefore

grant the Motion to Dismiss with respect to the March 5, 2024 topline results statement; Braunstein's statement in the January 4, 2024 press release that "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated[;]" Hulihan's RAISE II statement[;] and Hulihan's statement that Marinus "anticipate[d] enrolling the first patients in RAISE II prior to the end of the year." (See Am. Compl. ¶¶ 93, 97.) We deny the Motion with respect to Defendants' argument that the statement in Marinus's Third Quarter 2023 Form 10-Q regarding reaching the enrollment target and the statement in Marinus's March 5, 2024 press release regarding the number of patients to be randomized.

### B.   Scienter

To allege scienter, "the PSLRA requires that the plaintiff's pleadings conjure a 'strong inference' that the defendant acted with the necessary state of mind, that is, with intent to defraud shareholders." Fan, 927 F.3d at 717-18 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Scienter may also be shown by a 'knowing or reckless state of mind,' which in this securities context would be demonstrated by pleading 'an extreme departure from the standards of ordinary care.'" Id. (quoting Avaya, 564 F.3d at 252, 267 n.42). "A strong inference of scienter 'must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Id. (quoting Tellabs, 551 U.S. at 314).

#### 1.   Motive

Defendants argue that the Amended Complaint should be dismissed because it does not allege facts that would show that Defendants had a motive to defraud. "A strong inference of scienter can be shown '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" In re Rite Aid Corp. Sec. Litig., Civ. A. No. 22-4201,

39

2025 WL 968306, at *11 (E.D. Pa. Mar. 31, 2025) (quoting GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004)); see also Leder v. Shinfeld, Civ. A. No. 06-1805, 2008 WL 2165097, at *6 (E.D. Pa. May 22, 2008) (stating that "fraud without motive 'makes little economic sense'" (quoting In re Digital Island Sec. Litig., 357 F.3d 322, 331 (3d Cir. 2004)). However, while the presence of motive "can be persuasive when conducting a holistic review of the evidence," "it is not necessary to plead motive to establish that a defendant acted with scienter." Rahman v. Kid Brands, Inc., 736 F.3d 237, 245 (3d Cir. 2013) (citing Tellabs, 551 U.S. at 325-26). We therefore decline to dismiss the Amended Complaint on the ground that it fails to allege that any of the Defendants had motive to commit fraud.

### 2.    Conscious Misbehavior or Recklessness

Defendant also argues that we should dismiss the Amended Complaint because it fails to plead sufficient facts to create a strong inference that they acted consciously or recklessly. The Amended Complaint's allegations regarding Defendants' states of mind are based on information from three unnamed former employees of Marinus, FE1, FE2, and FE3. (See Am. Compl. ¶¶ 74-85.) Defendants contend that we should discount these allegations because they are based on information from confidential witnesses. The Third Circuit has instructed that we should consider the following in weighing information provided by confidential sources: the detail given by the sources, "the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Avaya, 564 F.3d at 261 (quoting Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)).

As we discussed earlier, the Amended Complaint alleges that FE1 was the Senior Vice President of Biometrics at Marinus from September 2020 until September 2024 and "oversaw [the]

40

design, conduct, and analysis of clinical trials for regulatory approvals." (Id. ¶ 76.) He was in charge of the statisticians and programmers who worked on the RAISE trial and reported directly to Hulihan. (Id.) FE1 repeatedly told Hulihan months before the interim analysis that Marinus should not perform the interim analysis because the trial would need to pass a higher bar to reach statistical significance in an interim analysis than it would need if Marinus waited to do a fully enrolled analysis. (Id. ¶ 77.) The Amended Complaint also alleges that Hulihan passed this recommendation on to Braunstein. (Id.) FE1 is also alleged to have stated that Hulihan told him, months before the interim analysis was conducted, that Marinus would stop the RAISE trial early, regardless of the outcome of the interim analysis, because Marinus did not have the funds to complete the RAISE trial and that the decision to stop the RAISE trial early had been approved by Braunstein. (Id. ¶ 78.) Having considered the Avaya factors, we find that these allegations contain sufficient indicia of reliability to be considered in our determination of whether the allegations of the Amended Complaint create a strong inference of scienter.

Defendants also argue that these allegations are not indicative of scienter because "[d]issatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, make for interesting reading but not an actionable securities fraud claim." Espy v. J2 Global, Inc., 99 F.4th 527, 533 (9th Cir. 2024); see also Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 998 (9th Cir. 2009) (determining that allegations that "demonstrate[d] only that there was some disagreement within the corporation over its accounting processes" were insufficient to demonstrate that defendants were deliberately reckless). However, the Amended Complaint does not merely allege that FE1 disagreed with Defendants' decision to perform the interim analysis. The Amended Complaint alleges the basis of FE1's advice to Hulihan, specifically that FE1 was Marinus's Senior Vice President of Biometrics and oversaw the design,

41

conduct, and analysis of Marinus's trials. (Am. Compl. ¶ 76.) Viewing the allegations of the Amended Complaint in the light most favorable to Plaintiff, it alleges more than mere dissatisfaction with Marinus's strategy. Rather, the Amended Complaint specifically alleges FE1's advice to Hulihan that Marinus should not conduct the interim analysis because the trial would have to pass a higher bar to reach statistical significance than it would if Marinus waited to do a fully enrolled analysis. (Id. ¶ 77.) The Amended Complaint further alleges that Hulihan told FE1 that Marinus would perform the interim analysis anyway and would terminate the RAISE trial early, regardless of the outcome of the interim analysis, because Marinus did not have the funds to complete the RAISE trial. (Id. ¶ 78). We conclude that these allegations demonstrate more than some disagreement within the corporation about the manner in which the RAISE trial should be conducted and, instead, support a conclusion that Defendants acted with scienter in making public statements that were positive about the potential outcome of the interim analysis of the RAISE trial when they knew that there was a low probability that it would meet the stopping criteria.

The Amended Complaint alleges that FE2 was Marinus's Director of Clinical Operations and that he heard multiple Marinus employees say that Marinus had decided "to stop the RAISE trial at the interim analysis regardless of the outcome due to financial reasons." (Id. ¶ 79.) Defendants argue that the allegations that FE2 heard Marinus employees discussing plans to pre-emptively stop the RAISE trial at the interim analysis due to financial reasons are insufficiently specific to satisfy the PLSRA. While the Amended Complaint alleges that FE2 was the Director of Clinical Development Operations for Marinus (Am. Compl. ¶ 79), it does not allege the time period in which FE2 worked for Marinus or the time period in which FE2 overheard other Marinus employees discussing Marinus's plans to stop the RAISE trial. The Amended Complaint also fails to allege whether those other Marinus employees worked on the RAISE trial or were in a position

42

to have direct knowledge of Marinus's plans with respect to that trial.  It appears, therefore, that the allegations regarding FE2 merely report rumors overheard by FE2 that have no indicia of reliability.  Having weighed the Avaya factors, we conclude that the allegations regarding the information overheard by FE2 lack sufficient indicia of reliability to be considered in our determination of whether the allegations of the Amended Complaint create a strong inference of scienter.

FE3 is alleged to have been a Senior Clinical Trial Manager at Marinus from August 2023 to April 2024.  (Id. ¶ 80.)  The Amended Complaint further alleges that, according to FE3, Marinus's Head of Data Management, George Laskaris, told Defendants that the RAISE trial had "serious data management and data integrity issues."  (Id. ¶ 81.)  The Amended Complaint also alleges that issues with "messy" data could "render[] differences in outcome between IV ganaxolone and [a] placebo harder to detect" and that  Marinus would have to expend considerable resources to clean up the data at the RAISE trial sites to ensure uniformity but "Defendants deliberately failed to expend the resources necessary to clean the data." (Id.)  The Amended Complaint also alleges that FE3 heard Laskaris tell Hulihan about the problems with trial data integrity in January 2024.  (Id. ¶ 82.)  In addition, Laskaris told FE3 that "management was not . . . doing anything about the data management issues" and that Hulihan had dismissed his concerns. (Id.)  According to FE3, Laskaris advised Marinus's management not to do the interim analysis of the RAISE trial because of these concerns.  (Id.)

We find that the Amended Complaint alleges the time period in which FE3 worked for Marinus, his position at Marinus, the source of his information, and basis of his sources' knowledge.  Having considered the Avaya factors, we find that the Amended Complaint's allegations regarding information provided by Laskaris to FE3 contain sufficient indicia of

43

reliability to be considered in our determination of whether the allegations of the Amended Complaint create a strong inference of scienter. We further conclude that these allegations support a strong inference that Defendants acted with scienter in making public statements that were positive about the potential outcome of the interim analysis of the RAISE trial when they knew that there was a low probability that it would meet the stopping criteria because the RAISE trial had serious data management and data integrity issues that made it harder to detect whether the use of IV ganaxolone resulted differences in patient outcomes. (Id. ¶ 81.) We conclude, based on the allegations regarding information provided by FE1 and FE3, that the Amended Complaint alleges facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Rite Aid Corp. Sec. Litig., 2025 WL 968306, at *11 (quotation omitted).

Defendants also argue that the Amended Complaint fails to sufficiently allege scienter because we could draw an innocent inference from its allegations and from Defendants' exhibits. See Fan, 927 F.3d at 718 (stating that "[a] strong inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." (quotation omitted)). Defendants contend that we can infer that they lack scienter from the fact that Marinus conducted the interim analysis, because the interim analysis was expensive. This argument is, however, based entirely on supposition. Defendants also argue that we can infer that they lack scienter because Braunstein purchased shares of Marinus a few weeks prior to the announcement of the results of the interim analysis and the resulting fall in the price of Marinus stock. In support of this argument, Defendants ask us to take judicial notice of a Form 4 dated March 27, 2024, and filed with the SEC, which shows that Braunstein purchased 50,000 shares of Marinus stock on March 27, 2024. (See Defs. Ex R.) However, while we take judicial notice of this document, we cannot draw the inference that Braunstein's purchase means that he lacks scienter. Neither the Amended Complaint

44

nor any of the documents submitted by Defendants for our consideration in connection with the instant Motion shed any light on Braunstein's motivation for purchasing those shares and we decline to draw an inference favorable to Defendants based solely on supposition. We accordingly deny the Motion to Dismiss based on Defendants' argument that the Amended Complaint fails to allege sufficient facts to establish scienter.

C.      Loss Causation

Defendants also argue that we should dismiss the Amended Complaint because it fails to sufficiently plead loss causation. Loss causation is "a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (citations omitted). Thus, under the PSLRA, a complaint must "adequately allege that, when the truth was revealed about [the defendants'] fraudulent statements, Plaintiffs suffered an economic harm as a result (loss causation)." City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp, 908 F.3d 872, 883 (3d Cir. 2018) (citing Dura, 544 U.S. at 342).

> In this Circuit, loss causation is generally proven by: (1) corrective disclosures, where the misrepresentation or omission is revealed and a decline in the price of a security follows; or (2) 'materialization of the risk,' where the occurrence of an event—the risk of which was hidden by misrepresentations or omissions—reveals the falsity of those misrepresentations or omissions.

In re Mylan N.V. Sec. Litig., Civ. A. No. 20-955, 2025 WL 1874621, at *2 (W.D. Pa. July 8, 2025) (citing Howard v. Arconic Inc., Civ. A. No. 17-1057, 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021); In re Aurora Cannabis, Inc. Sec. Litig., Civ. A. No. 19-20588, 2021 WL 2821167, at *15 (D.N.J. July 6, 2021)). "There is not a heightened standard of pleading for loss causation." In re Five Below, Inc. Sec. Litig., 2025 WL 2447794, at *30. Consequently, "[t]o plead loss causation, Plaintiffs must 'provide[] the defendants with notice of what the relevant economic loss

45

might be or of what the causal connection might be between that loss and the misrepresentation.'" Id. (second alteration in original) (quoting Dura, 544 U.S. at 347).

The Amended Complaint alleges that on April 15, 2024, Marinus issued a press release before the market opened revealing that "the RAISE trial had not met early stopping criteria and also that the Company would implement cost-saving measures," which included stopping enrollment in the RAISE trial, even though the DMC recommended continuing the Phase 3 RAISE trial.  (Am. Compl. ¶ 112.)  The Amended Complaint further alleges that, following this news, Marinus's stock price fell 82.7%, or $6.22/share, to a low of $1.30/share on April 15, 2024.  (Id. ¶ 113.)  Marinus's stock fell an additional $0.10/share the next day, closing at $1.20/share.  (Id.)  On May 8, 2024, before the market opened, Marnus filed a Form 8-K with the SEC, which attached a press release announcing that Marinus had "[s]topped clinical trial enrollment in the RAISE and RAISE II trials," "[d]eferred IV ganaxolone manufacturing investment . . .," "[r]educed the Company's workforce by approximately 20%," and stopped the phase 3 RAISE II trial.  (Id. ¶¶ 114-15 (emphasis omitted).)    The Amended Complaint further alleges that *Fierce Biotech* published an article about Marinus later that day that mentioned cost-cutting measures being implemented by Marinus as a result of the problems with the Phase 3 RAISE trial, including laying off a fifth of its workforce, and noting the possibility that the company would make additional cost reductions.  (Id. ¶ 116.)  The Amended Complaint alleges that, as a result of this news, the price of Marinus's stock fell $0.14/share, to a low of $1.43/share on May 8, 2024.  (Id. ¶ 117.)

Defendants argue that these allegations are insufficient to plausibly allege loss causation because they only allege that the company's stock price dropped after it revealed disappointing news about the interim analysis.  See Fort Worth Emps.' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (finding that the complaint did not identify a "corrective disclosure"

that revealed the existence of some prior alleged misrepresentation where the decline in the price of the defendant drug company's stock was caused by an announcement that the FDA had failed to approve a drug, not by the corrective disclosure of a prior untruth).  However, unlike the complaint in Biovail, the Amended Complaint in this action alleges that Defendants made optimistic statements about the probable success of the interim analysis even though they had been warned that there was a low probability of the RAISE trial meeting both co-primary endpoints in the interim analysis.  (See Am. Compl. ¶¶ 74-85.)  The Amended Complaint in this case further alleges that once the risk of the interim analysis not meeting its co-primary endpoints materialized, and Marinus announced that it could not continue the trial, the Company's stock price declined. (Id. ¶¶ 112-116.)  We therefore find that the Amended Complaint plausibly alleges causation in the form of "'materialization of the risk.'"  See In re Mylan, 2025 WL 1874621, at *2 (citations omitted),

Defendants also argue that the Amended Complaint fails to plausibly allege causation because the disclosures allegedly made by Marinus on April 15 and May 8, 2024, and described in the *Fierce Biotech* article did not reveal that Defendants' earlier optimistic statements were untrue because the probability that Marinus would stop enrollment in the RAISE trial was a known risk.  See Monroe Cnty. Empls.' Ret. Sys. v. YPF Sociedad Anonima, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) (concluding that a disclosure of "the materialization of a known risk, rather than the disclosure of a concealed one" was insufficient to allege loss causation).  Defendants contend, specifically, that the decision to stop enrollment in the RAISE trial was consistent with its prior disclosures.  They rely on an analyst report from Jefferies, which was published on April 15, 2024, and states that "[o]ur understanding is the company previously suggested it would essentially elect to stop the study if this specific scenario occurred."  (See Defs. Ex. T at 1.)  This analyst report  is

47

not mentioned in the Amended Complaint. We cannot take judicial notice of the opinions of analysts "for the truth of the matter stated therein: only the fact that these opinions were published can be noticed." See In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 391 (D.N.J. 2010). Defendants' argument would be persuasive only if we took judicial notice of this statement for the truth of the matter asserted, i.e., that Marinus had previously disclosed that it would stop the RAISE trial in this specific scenario, and that we cannot do. See id. Consequently, we conclude that the Amended Complaint plausibly alleges loss causation and we deny the Motion to Dismiss as to this argument.

## IV.    CONCLUSION

For the foregoing reasons, we grant the Motion to Dismiss in part and deny it in part. We grant the Motion with respect to Defendantss' argument that the following statements, which are alleged in the Amended Complaint to be fraudulent and material, are immunized by the safe harbor provision of the PSLRA:

(1) Braunstein's statement, quoted in Marinus's November 7, 2023, press release, that Marinus is "committed to successfully completing both the RAISE and TrustTSC trials in 2024 and continue[s] to make the investments to prepare for these commercial launches." (Am. Compl. ¶ 86);

(2) Braunstein's statement during the November 7, 2023, conference call that "with the success of ZTALMY, the recent extension of our cash runway into Q4 2024 and tightening of our spend to focus on our most valuable market opportunities, we believe we have the appropriate resources required to complete 2 key data readouts and prepare for a bright future." (id. ¶ 91 (emphasis omitted));

(3)  the statement in Marinus's January 4, 2024, press release that Defendants expected the Company's "cash position to fund the Company's operating expenses, capital expenditure requirements, and maintain the minimum cash balance of $15 million required under the Company's debt facility into the fourth quarter of 2024."  (id. ¶ 98 (internal quotation marks omitted));

(4) Braunstein's statement, quoted in Marinus's January 4, 2024, press release, that  "[w]e expect 2024 will be another pivotal year for Marinus with two Phase 3 data readouts anticipated" (id. ¶ 97 (alteration in original));

(5) Hulihan's statement during the March 5, 2024, conference call that, after reaching the enrollment requirement for the interim analysis, Defendants "continue[d] to expect to report top line results in the second quarter of 2024." (id. ¶ 106 (emphasis omitted));

(6) Hulihan's statements during the November 7, 2023, conference call that:  "[f]ollowing a successful interim analysis, we plan to begin transitioning the majority of RAISE sites to open-label enrollment and then shortly transition a subset of these sites to the RAISE II study" and that Marinus "anticipate[s] enrolling the first patients in RAISE II prior to the end of the year."  (id. ¶ 93 (emphasis omitted)).

We deny Motion to Dismiss with respect to all of Defendants' other arguments.[13]  An order follows.

---

[13] Defendants have also moved to dismiss Count II of the Amended Complaint, which asserts a claim brought pursuant to Section 20(a) of the Exchange Act.  "Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)."  Avaya, 564 F.3d at 252 (citing 15 U.S.C. § 78t(a); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006)).  Defendants argue that we should dismiss Count II of the Amended Complaint, which asserts a claim against all of the individual Defendants, on the ground that the Amended Complaint cannot state a claim for controlling person liability under Section 20(b) of the Exchange Act because it does not state a cognizable claim for relief under Section 10(b) of the Exchange Act.  See Rahman, 736 F.3d at 247 (stating that controlling person liability under Section 20(a) of the Exchange Act "'is derivative of an underlying violation of Section 10(b)

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

by the controlled person'" (quoting <u>Avaya</u>, 564 F.3d at 252)).  We have not, however, granted the entirety of Defendants' Motion to Dismiss as to all of Plaintiff's Section 10(b) claim. Consequently, we deny Defendants' Motion to Dismiss as to Count II of the Amended Complaint.